[No. 25732-3-I.    Division One.    February 10, 1992.]

HERBERT E. MULL, *Appellant*, v. THE CITY OF BELLEVUE, *Respondent*.

*Evan E. Inslee, David J. Lawyer,* and *Inslee, Best, Doezie & Ryder P.S.,* for appellant.

*Richard L. Andrews, City Attorney,* and *David E. Kahn* and *Lori Molander, Assistants,* for respondent.

AGID, J. — Herbert E. Mull appeals a summary judgment order dismissing his negligence claim against the City of Bellevue (the City). Mull contends that the City negligently misrepresented the maximum allowable building height applicable to his proposed construction project. We affirm.

In March 1984, Rick Ryerson, on behalf of Mull-Ryerson Ventures (Mull-Ryerson), applied for a building permit to construct three 2-story office buildings, designated buildings "A", "B" and "C". Because the proposed building site was in an area zoned Professional Office and designated a "Transi-

tion Area",[1] the proposal was subject to the City's Administrative Design Review (ADR) process.[2] BLUC 20.10.240, 20.20.900, 20.25D.010. Mull-Ryerson submitted plans to build three 2-story office buildings with a height of 19 feet each. In July 1984, the City issued its ADR staff report, conditionally approving the proposal. The report states that the building height of each structure would be 19 feet "above average grade". In section V of the report, entitled "TRANSITION AREA REQUIREMENTS", the staff compared the proposal with certain land use code requirements. With respect to building height, the report reads:

|  | Required | Proposal |
|---|---|---|
| Height: | 30 feet maximum | 19 feet above average grade |

Mull-Ryerson's proposal also included the modification of several transition area requirements. The staff concluded that the planning director was permitted to approve the modification of those requirements if the proposal met certain criteria. One of those criteria was that "[t]he proposal does not modify any *height* or setback limits of the underlying Land Use District [Professional Office]". (Italics ours.) The report also concluded that "[t]he proposed office park *as described above* meets the Professional Office district requirements of the Land Use Code". (Italics ours.) Contrary to the ADR report's representation that the maximum building height was 30 feet, the land use code provided that

---

[1] The site was designated a "Transition Area" on the basis that it borders a single-family residential neighborhood. *See* Bellevue Land Use Code (BLUC) 20.20.900.

[2] BLUC 20.25D.010 provides:

"All Structures Subject to Design Review: The City will not issue building permits for new construction in the PO [Professional Office] District until the Director of Design and Development has reviewed the building plans and has certified that in his judgment the plans for the structure's exterior, including finish material, color and landscaping, are visually harmonious and compatible with the surrounding land uses, vegetation and topography to promote quality design, reduce the adverse impact of uncoordinated development and protect and enhance the surrounding neighborhoods.

"Development in PO Districts will be reviewed through Design Review (Part 20.30F)."

the maximum building height in a Professional Office zone was 20 feet. BLUC 20.20.010. Based on the ADR report, the City issued Mull-Ryerson a building permit, and it began construction.

During site excavation for building C, the contractors discovered unstable soil and determined that they would have to dig deeper to reach stable soil conditions. Mull-Ryerson decided to construct a concrete foundation that would extend down to solid footing. Ryerson met with Ron Hanson of the City's Design and Development Department regarding his proposal to revise the plans to allow construction of a basement storage area under the east half of building C. Ryerson recounts his discussion with Hanson as follows:

> In my discussion with Mr. Ron Hanson, . . . I explained what I wanted to do and that was to put a storage area as a basement in Building C. Mr. Hanson told me that this would not be a significant deviation that would require any other review process. At that time, I explained to Mr. Hanson that although I would be digging down deeper than the original anticipated excavation, *I would not be digging down a full story or basement height and therefore, the basement floor would be lower[ed] several feet and the building height would be raised. Mr. Hanson told me that the raising of the building attributable to the installation of the basement storage area was not significant*; however, his main concern and prime issue with me at that time was whether or not there would be additional parking requirements imposed due to this additional adding of space.

(Italics ours.)

Ryerson's architect, Norm Denton, prepared revised plans reflecting the addition of a basement storage area under the east half of building C. Denton submitted the plans to the City in July 1985. Handwritten notes in red ink appear on some of the plans. One of the notations on Plan A-1 reads:

Bldgs. "A" and "C" Revised Exit Stairs
Bldg. "C" Added Basement
See notes sheets A2, A3, A4 & S1.

Ryerson contends that this was written by city officials. Plan S-1 is entitled "Bldg. 'C' - Foundation Plan and Basement Floor Plan. Partial First Floor Framing Plan". In his

affidavit, Mull acknowledges that the plans reviewer would have had to have read plans A-2, A-4 and S-1 together in order to understand that building C was to be a 3-level structure. He further states that the elevations shown on the revised plans "did not depict or attempt to even show the storage area in the basement". He continues:

> Only S-1 showed the basement floor plan. Without an elevation showing the three levels, there would be absolutely no basis upon which the City or any other planning or reviewing official could determine or make the judgment that the basement storage area was going to be all "below grade" or not observable, or that the addition of the basement would not increase the overall soffit height of the building.

Mull concludes that he was not concerned about a "height problem" with building C anyway because he understood the height limit to be 30 feet. The City approved the revised plans in August 1985 without further design review.

In September 1985, Mull took over management of the project. He asked Denton to discuss with city planning officials the feasibility of expanding the basement and converting some of it to office space. Denton discussed the proposal with city planner Paul Cohen. Denton states that Cohen responded that the change was acceptable if, among other conditions, the building height was not "substantially" altered and the height limit was not exceeded. Cohen qualified his response by stating that "he would not know for sure without actually having the documents or plans revised and submitted for review". Denton submitted plan revisions to the City in July 1986. The revisions/additions form described the proposed changes as follows:

> We are changing 3,600 square feet of storage area in the basement to office space and finishing the remainder of the basement area to storage area.

The City never acted on the July 1986 revision because Denton requested approval of further revisions in January 1987. The revisions/additions form for the 1987 revision states that the "existing basement" will be enlarged and the interior stairway relocated. No changes in building height or finished grade are noted. Plan A-5B depicts

height measurements above the finished grade for building C of 20 feet 11 inches on one side and 24 feet 11 inches on the other. While Denton circled the stairwell changes and the basement floor plan, he did not highlight the building height changes.

The City approved the January revisions in February 1987. Mull-Ryerson had completed construction of the basement and first floor of building C and begun construction of the second floor when a neighboring resident complained to the City that building C possibly violated land use code provisions. City officials inspected the site and determined that the building, if completed as planned, would exceed the land use code's maximum allowable height for Professional Office zoning. As a result, the City issued a stop work order for building C. After some negotiations with the City, Mull decided to finish the building with only two levels.

In May 1988, Mull filed a negligence claim against the City seeking damages for planning, engineering and building costs and lost rental income and property value associated with the City's refusal to allow him to add a third level to building C. The City moved for summary judgment. After concluding that the City owed no duty to Mull, the trial court granted the motion and issued an oral order dismissing Mull's claim. Mull now appeals.

■ In reviewing an order granting summary judgment, this court engages in the same review as the trial court and considers all reasonable inferences from the evidence in the light most favorable to the nonmoving party. *Meaney v. Dodd*, 111 Wn.2d 174, 177, 759 P.2d 455 (1988). Summary judgment should be granted when there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Meaney*, 111 Wn.2d at 177-78.

The issues presented are: Did the City owe Mull a duty of care? If so, was that duty violated when the City represented to him that the height restriction applicable to his proposed

19-foot office building was 30 feet? Because the answer to the first question is no, we do not reach the second.

■ Traditionally, regulatory statutes and municipal laws impose duties on public officials owed to "the public as a whole" and not to specific individuals. *Meaney*, 111 Wn.2d at 178; *Honcoop v. State*, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988). Thus, under the public duty doctrine, a plaintiff cannot recover from a municipal corporation unless he or she can show that the city owed a duty to the plaintiff as an individual and not merely to the public in general. *Meaney*, 111 Wn.2d at 178. A plaintiff can show that a municipality has assumed a duty to him or her as an individual by establishing the elements of the "special relationship" exception to the public duty doctrine. *See Meaney*, 111 Wn.2d at 178.

Mull argues that he had a "special relationship" with the City which obligated the City to exercise reasonable care in imparting information to Mull regarding the height limit for building C. A special relationship is created when:

> (1) there is direct contact between the public official and the plaintiff, (2) the official, in response to a *specific inquiry*, provides *express assurances* that a building or structure is in compliance with the building code, and (3) the plaintiff justifiably relies on the representations of the official.

(Italics ours.) *Taylor v. Stevens Cy.*, 111 Wn.2d 159, 171, 759 P.2d 447 (1988).[3] Such express assurances, justifiably relied upon, give rise to a duty on the part of the public official to act as promised. *Meaney*, 111 Wn.2d at 179.

■ Ordinarily, a building permit applicant is responsible for ensuring his or her own compliance with codes, regula-

---

[3]The *Taylor* court overruled *J&B Dev. Co. v. King Cy.*, 100 Wn.2d 299, 669 P.2d 468, 41 A.L.R.4th 86 (1983). In *J&B Dev. Co.*, the court held that a building permit applicant could rely on a public official's inherent assurance that a structure complied with all applicable codes because such an assurance was implicit in the official's permit approval. Rejecting the assumption that the issuance of a building permit implies that the plans submitted comply with all applicable codes, the *Taylor* court held that the public official must make express assurances in response to the applicant's specific inquiry. *Taylor*, 111 Wn.2d at 167.

tions and ordinances. *Taylor*, 111 Wn.2d at 168; *Meaney*, 111 Wn.2d at 179. As the *Meaney* court held:

> It is only where a *direct inquiry* is made by an individual and incorrect information is clearly set forth by the government, *the government intends that it be relied upon* and it is relied upon by the individual to his detriment, that the government may be bound.

(Italics ours.) 111 Wn.2d at 180.

■ Mull argues that the City's misrepresentation in its ADR staff report that the height limit for buildings in the Professional Office zone was 30 feet constituted an express assurance upon which he relied to his detriment. He further argues that he had "direct contact" with city officials through Ryerson and Denton, and that the City "reaffirmed" its earlier misrepresentation during these interactions. Mull cites *Rogers v. Toppenish*, 23 Wn. App. 554, 596 P.2d 1096, *review denied*, 92 Wn.2d 1030 (1979) in support of his argument. In *Rogers*, the agent of a prospective property buyer contacted the zoning administrator and inquired whether a specific parcel of property was zoned for an apartment building. The zoning official incorrectly told Rogers' agent that the zoning allowed construction of apartments on the property, and Rogers bought the property in reliance on the official's express assurance. Because the City did not keep its zoning maps or records current, Rogers could verify his understanding of the current zoning classification only by asking the zoning administrator. On these facts, the court held that a zoning official owes a duty to an individual who inquires about the zoning classification for a specific piece of property and informs the official of the purpose of his inquiry. *Rogers*, 23 Wn. App. at 558.

*Rogers* is distinguishable from the present case for several reasons. Unlike Rogers' specific inquiry concerning the zoning classification for a particular parcel of property, Mull never specifically asked about the maximum building height for Professional Office zone buildings. Mull initially proposed the construction of three 19-foot office buildings. The ADR report considered and approved only this proposal.

Moreover, the 30-foot height limit language must be read in conjunction with section IX.B.2 of the ADR report, which states that the proposal does not exceed the applicable height limit for the underlying land use district, *i.e.*, the Professional Office zone. Thus, while the insertion of the 30-foot height limit language was unfortunate, it cannot be reasonably interpreted as authorizing Mull to build a 30-foot structure. With respect to any "assurance" given by the City in the ADR report, Mull's only specific inquiry at that time was limited to whether his proposed *19-foot* buildings complied with applicable codes. Since his proposal did comply with the correct 20-foot height limit, we cannot construe the error in the ADR report as an "assurance" that Mull could do something he had not asked to do, *i.e.*, construct a building in excess of 20 feet.

Nor can one infer from the Ryerson-Hanson and Denton-Cohen discussions that the City expressly assured building C's compliance with the zoning code's height requirement. In response to Ryerson's statement that constructing a basement would raise the height of building C, Hanson stated that the height increase "would not be significant". Because Ryerson did not tell Hanson how many feet he would be raising the building, Hanson cannot be charged with erroneously assuring Ryerson that the building met the height requirement. This is especially true in view of the 1-foot increase in height that would be permitted under the 20-foot limit. Thus, unlike the plaintiff's inquiry in *Rogers*, Ryerson's was not specific.

Cohen's response to Denton's inquiry also does not rise to the level of an "express assurance". Cohen stated that Mull's proposal to convert part of the basement to office space would comply with the zoning code if the building's height was not "substantially" altered. Further, he stated that he could not assure Denton of compliance until he reviewed the plans showing the proposed changes. When Denton submitted those plans, however, he failed to note on the revisions/additions form that the proposed changes included an increase in the height of building C. Thus, the

City was only notified of the actual increase in building height by means of Plan A-5B, which shows elevations for building C. This plan, submitted with numerous other drawings, was not submitted until at least 6 months after Denton's general discussion with Cohen. Further, while Denton circled the other revisions in red ink, he did not circle the elevation changes. Under these facts, Denton did not specifically inquire whether his proposal to increase the building height by 4 feet complied with the zoning code. Nor can the City's approval of the plans, in itself, be deemed an express assurance of compliance. *Taylor*, 111 Wn.2d at 167. Finally, unlike Rogers, Mull could have determined the height limitation by referring to the zoning code.

The facts of this case are similar to those in *Meaney*. In *Meaney*, Dodd applied for a special use permit to operate a sawmill on his property. Although Dodd generally requested planning department assistance in determining his proposal's compliance with applicable code requirements, he did not specifically request information concerning existing noise level regulations. The only reference to noise levels was in the environmental checklist, submitted by Dodd, which indicated that a "minimum" increase in noise would be noticed. After neighbors complained about high noise levels, the county determined that the noise level of the mill violated code limits, and revoked Dodd's permit.

Reviewing Dodd's cross claim for negligence against the County, the court held that the County was entitled to rely on Dodd's representation that the sawmill would create only a minimal increase in noise. The court observed that Dodd never informed the County of the *specific* noise level at which the sawmill would operate, nor did he seek or obtain an unequivocal, express assurance from the County that the mill complied with its noise regulations. *Meaney*, 111 Wn.2d at 180. Similarly, in this case Mull never expressly informed the City that building C would be 4 feet higher than the building originally approved in the ADR report. Nor did the plans submitted clearly note the height change or give information that would have been sufficient to allow city

officials to calculate the increased height. Thus, we cannot even conclude that a question of fact exists as to whether the City expressly assured Mull that a 4-foot increase in height complied with the zoning code.

In *Taylor*, the court held that individual permit applicants, builders and developers, and not local governments, are responsible for ensuring compliance with building codes. *Taylor*, 111 Wn.2d at 168. The court cited several policy considerations in support of its holding. First, it stated that building codes are designed to protect public safety, health and welfare, not to protect individuals from economic loss caused by public officials. Second, the court reasoned that, given budgetary and personnel constraints, it would be unreasonable to place the burden on local government to ensure compliance with building codes. Third, the court observed that builders still have a legal obligation to comply with statutes notwithstanding approval of building plans and satisfactory inspections. Fourth, the court's holding was consistent with the zoning vested rights doctrine, which protects the applicant's right to develop land only if he or she fully complies with the zoning and building codes in existence at the time of application.

Finally, the *Taylor* court concluded that it was imprudent to shift the risk of erroneous permit issuance and inspections to local governments.

> This shift in responsibility provides an economic disincentive to private contractors to conduct their own examination of the building and zoning codes. Instead, developers can rely on the municipality to insure that the permit application complies with all relevant codes and ordinances, secure in the knowledge that if the public official failed to discover all the errors in the submitted application, the developer would be indemnified for any resulting losses.

(Footnote omitted.) [Comment, *Municipal Tort Liability for Erroneous Issuance of Building Permits: A National Survey*, 58 Wash. L. Rev. 537, 560 (1982-1983).] Requiring local government to indemnify an individual for losses resulting from the negligent administration of building codes imposes substantial costs on local government with little or no corresponding benefit.

*Taylor*, 111 Wn.2d at 170.

■ The same policy concerns expressed in *Taylor* apply with full force here. As with building codes, the purpose of zoning is to protect the public health, safety and welfare. *See Norco Constr., Inc. v. King Cy.*, 97 Wn.2d 680, 649 P.2d 103 (1982). Budgetary and personnel constraints present the same obstacles to enforcement of zoning codes as to building codes. Further, placing the burden on the City in this case would remove the applicant's incentive to do his own review of the zoning code.[4] As Mull acknowledges in his brief, neither he nor Ryerson specifically inquired about applicable height restrictions because they relied on the inaccurate information in the ADR report. Holding the City responsible for that erroneous statement, particularly when it appeared in the context of a report approving a 19-foot building that complied with the actual 20-foot height limit, would place too heavy a burden on local governments with no corresponding benefit to the public.

In his reply brief, however, Mull intimates that neither he nor Ryerson could have ascertained whether a 23-foot building met zoning code requirements because the ADR process is "discretionary". This argument is unpersuasive for three reasons. First, the height limit in the Professional Office zone is clearly contained in the BLUC. BLUC 20.20.010. Second, the design review provision, BLUC 20.25D.010, indicates that the design review and development director's review of the structure's "exterior, *including finish material, color and landscaping*" is discretionary. (Italics ours.) *See* BLUC 20.25D.010 (quoted in footnote 2). This provision does not allow the director to impose height restrictions different from those set forth in the zoning code. Third, the ADR report clearly states that the proposal may not be approved if it modifies any height limits of the underlying land use

---

[4]We emphasize, however, that in certain cases, the City may be held liable for negligently supplying erroneous information on which the permit applicant reasonably relies. For example, in situations where the information requested does not appear in the code, the answer is unclear, or the applicant seeks affirmation of his or her interpretation of the code, the City is required to exercise due care in providing that information.

district. Thus, the ADR report itself indicates that the zoning code's height restrictions must be complied with and are not discretionary. On this basis, Mull's implied argument that he could not have determined his proposal's compliance with the zoning code's height restrictions by reference to the code must fail.

The summary judgment is affirmed.

GROSSE, C.J., and SCHOLFIELD, J., concur.