[No. 29128-9-I. Division One. April 4, 1994.]

ROBERT JOHNSON PEPPER, ET AL, *Appellants*, v. J.J. WELCOME CONSTRUCTION COMPANY, ET AL, *Respondents*.

526

*Camden M. Hall, Cynthia R. First, Thomas L. Weinberg,* and *Foster Pepper & Shefelman,* for appellants.

*Sandra Bates Gay* and *Gay & Steinacker, P.S.; Richard Lawrence Martens, Maureen L. Hoy, Stephen G. Skinner,* and *Johnson & Martens; George W. Akers, Michael W. Babcock,* and *Montgomery, Purdue, Blankinship & Austin; Mark R. Johnsen* and *Karr Tuttle Campbell,* for respondents. [As amended by order of the Court of Appeals May 6, 1994.]

WEBSTER, C.J. — Robert Pepper, Peggy Pepper French, and Larry and Debra Jaffe appeal an award of damages for

injury to their properties caused by excessive water runoff from a private residential development. They argue the trial court stripped away their claims against King County, severely impaired their claims against L.A., Betty, R.R., and Barbara Welcome, Joy and William Backstrom and J.J. Welcome Construction Company, and eviscerated the jury award. Welcome and Backstrom cross-appeal.

## FACTS

Pepper/Jaffe own adjoining properties at the eastern base of an upland plateau known as Novelty Hill. Welcome Wood is a Novelty Hill subdivision owned and developed by the Welcomes and Backstroms (Welcome). King County approved short plats for the Welcome Wood project in 1981/1982. Welcome hired Meriweather-Leachman to design the plans and J.J. Welcome Construction Company (owned by Welcome) to build a road and drainage system. J.J. Welcome subsequently revised the drainage system eliminating check dams and level overflows, which had been designed to reduce concentrated water runoff from the site.

The Welcome Wood road and drainage system were substantially complete in November 1983. The County gave final approval in April 1984, and accepted them for county maintenance in March 1985. Welcome sold lots with the last lot being sold in 1990. Various lot owners constructed homes, built driveways and cleared trees for views and pastures.

In the fall of 1978, Pepper first observed increased runoff and deposits of sediment on his property allegedly from Novelty Hill's clearing and grading of land. Similar problems occurred during the winter storms over the next several years.[1] Pepper filed suit in October 1986, and was joined by Jaffe in August 1987.

## DISCUSSION

Pepper/Jaffe claim the court erred in (a) dismissing their claims for inverse condemnation, injunctive relief, public and private nuisance, trespass, intentional tort, and Pepper's

---

[1]The record does not indicate that any of these storms were exceptionally harsh.

emotional distress claim, (b) limiting their damages to those occurring after 1983/1984, (c) reducing the jury's award of damages to the lesser of the cost of restoration or the diminution in value of their properties, (d) allowing the jury finding that the damage was temporary, and (e) ruling that the Washington tort reform act was not unconstitutional and that they were not entitled to attorneys' fees.[2] Welcome and J.J. Welcome cross-claim that the court erred in denying their summary judgment motions to dismiss.

## Welcome's Motion To Dismiss

Welcome claims that the court erred in denying their motion for summary judgment because they had no duty which would prevent them from developing and selling residential lots on their property and they are not personally liable for the acts of the independent contractor, J.J. Welcome; thus, there was no proximate cause between their activities and Pepper/Jaffe's injuries.

■ Here, it was disputed whether: (1) the 2- or 3-year statute of limitations applied; (2) the common law discovery rule had been met as to Jaffe; (3) the independent contractor, J.J. Welcome, was in fact independent; (4) Welcome had a nondelegable duty; and (5) Welcome negligently hired J.J. Welcome, the independent contractor. These issues were material to the outcome, and thus, the court properly denied the motion for a summary judgment of dismissal.

## J.J. Welcome's Motion To Dismiss

J.J. Welcome claims the court erred in finding a disputed issue of material fact as to whether it was Welcome's "alter ego". It argues it was entitled to a dismissal since it was an independent contractor and the 3-year statute of limitations had expired. It contends that the doctrine of piercing the "corporate veil" may apply to shareholders' liability for a corporation's actions, but not to a corporation's liability for its shareholders' acts.

---

[2]Assignments of error: Pepper/Jaffe, 34; J.J. Welcome, 3; Welcome, 5. We address only those assignments of error which are essential in determining the outcome of this appeal.

■ It is true that the "alter ego" doctrine is most commonly invoked to impose liability upon corporate officers for fraud committed by a corporation. However, this doctrine has also been recognized as imposing liability on a corporation for acts of its shareholders where the corporation and the shareholders are one and the same; hence, the act of the individual was the act of the corporation. *Standard Fire Ins. Co. v. Blakeslee*, 54 Wn. App. 1, 6, 771 P.2d 1172, *review denied*, 113 Wn.2d 1017 (1989).

Here, there was a genuine issue as to whether J.J. Welcome acted as an independent contractor, was one and the same as the Welcome Defendants, or acted as their agent. Thus, summary judgment dismissing J.J. Welcome would have been inappropriate. CR 56(c).

Inverse Condemnation Claims Against King County

Pepper/Jaffe claim that the court improperly dismissed their inverse condemnation claims against King County. They argue that in failing to enforce its own ordinances, the County took or caused damage to their property without just compensation.[3]

■ The term inverse condemnation has been used to describe an action alleging a governmental taking, brought to recover the value of property which has been appropriated in fact, but with no formal exercise of its eminent domain power. *Lambier v. Kennewick*, 56 Wn. App. 275, 279, 783 P.2d 596 (1989), *review denied*, 114 Wn.2d 1016 (1990). Liability may exist where the alleged taking or damage was caused by affirmative action of a government entity, *i.e.*, appropriating the land, restricting its use through regulation, or causing damage by constructing a public project to achieve a public purpose. *Rains v. Department of Fisheries*, 89 Wn.2d 740, 745-

[3]On review of a summary judgment order the appellate court considers only issues and materials which were before the trial court; matters outside that record are ignored. RAP 9.12; *Alexander v. Gonser*, 42 Wn. App. 234, 237, 711 P.2d 347 (1985), *review denied*, 105 Wn.2d 1017 (1986). In their brief Pepper/Jaffe refer extensively to the report of proceedings and trial exhibits which were not before the court on summary judgment. We limit our review to issues and materials which were before the court.

47, 575 P.2d 1057 (1978). A public project requires a "governmental enterprise, the value of which is enhanced by the State's actions". see *Maple Leaf Investors, Inc. v. Department of Ecology*, 88 Wn.2d 726, 733, 565 P.2d 1162 (1977).

Here, the damages to the Pepper/Jaffe properties were not the result of the County appropriating or regulating their use of the land. There was no allegation that Welcome Wood was a government project, or that King County affirmatively participated in any way. The fact that a county regulates development and requires compliance with road and drainage restrictions does not transform a private development into a public project. Since Welcome Wood was not a public project, the County did not appropriate Pepper/Jaffe's land, and land use regulation of their property did not cause the damages, no inverse condemnation was involved. The dismissal was proper.

Tort and Injunctive Relief Claims Against King County

■ Pepper/Jaffe next claim the trial court erred in dismissing the remainder of their tort and injunctive relief claims against the County. Those claims sound in negligence;[4] the elements of negligence are duty, breach, proximate cause, and resulting injury. *Alger v. Mukilteo*, 107 Wn.2d 541, 545, 730 P.2d 1333 (1987). To prove liability Pepper/Jaffe must first establish that King County owed them a duty of care. *Atherton Condominium Apartment-Owners Ass'n v. Blume Dev. Co.*, 115 Wn.2d 506, 528, 799 P.2d 250 (1990). The existence of a duty is a question of law. *Atherton*. Thus, we review the issue de novo.

The public duty doctrine which immunizes a municipality from claims based on the negligent or improper exercise of its regulatory authority is subject to four recognized exceptions: (1) legislative intent, (2) failure to enforce, (3) special relationship, and (4) rescue. None of these exceptions apply here.

---

[4]We note that the court dismissed the claims for nuisance and trespass combining those claims into a single claim sounding in negligence based on multiple theories.

_Legislative Intent._ Pepper/Jaffe claim that King County was liable under the legislative intent exception to the public duty doctrine. They argue that, as adjacent property owners, the King County Code (KCC) evidences a clear intent to identify and protect them. If a statute evidences a legislative intent to protect a particular class of individuals, members of that class may bring a tort action against the governmental entity for statutory violations. _Honcoop v. State_, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988).

■ Here Pepper/Jaffe assert that the county code stated it was intended to "protect property owners adjacent to developing land from increased runoff rates which could cause erosion of abutting property . . . and to decrease surface water damage to public and private property." Surface Water Runoff Policy, former KCC 20.50.010.[5] However, in _Taylor v. Stevens Cy._, 111 Wn.2d 159, 164, 168, 759 P.2d 447 (1988), the Supreme Court found that similar statutory language stating it intended to protect "building occupants" was primarily designed to protect the public and thus, the legislative intent exception was inapplicable to the occupants of a house. _Taylor_, at 165. Accordingly, we find that general precatory language in a statute does not identify a particular and circumscribed class of individuals. Because the statute referenced here was addressed to a general class of adjacent property owners, and it referenced the public, not a narrow class of specific property owners, the legislative intent exception does not apply.

In addition, the ordinance was revised: "to prevent erosion, flooding and other surface water damage; and to respect, preserve, and insure the safety of watercourses, roads, and rights-of-way." Ordinance 4938 § 1 (1980), former KCC 20.50.010. This revision removing the "property owners" and "abutting" language is a further indication that the Legislature did not intend protection for any particular group or class, rather it intended to protect the public in general.

■ Moreover, under the legislative intent doctrine, a municipality can be held liable only if it violates a duty

---

[5]References to KCC are as it existed in 1980 (ordinance 2281 § 1 (1975)). Surface Water Runoff Policy is now contained in chapter 9.04.

placed on it by statute. *Honcoop*, 111 Wn.2d at 188. The KCC places the duty squarely on property owners and developers, not on the County. Former KCC 20.50.030, .040, .060. The County need only comply with such requirements when it develops land. Former KCC 20.50.100. Because the County did not develop the Welcome Wood subdivision, here it had no duty, and, thus, cannot be held liable under the legislative intent exception to the public duty doctrine.

*Failure To Enforce.* Pepper/Jaffe also claim the County failed to enforce its code requirements. They argue that it was aware that the slopes and soil on Novelty Hill could pose runoff erosion problems, it allowed the development to proceed, permitted the installation of an inadequate drainage system which did not meet KCC requirements, and it did nothing to enforce those requirements.

■ "[I]ndividual permit applicants, builders and developers, and not local governments, are responsible for ensuring compliance with building codes." *Mull v. Bellevue*, 64 Wn. App. 245, 255, 823 P.2d 1152 (1992). However,

[a] general duty of care owed to the public can be owed to an individual

where [1] governmental agents responsible for enforcing statutory requirements [2] possess actual knowledge of a statutory violation, fail to take corrective action despite a statutory duty to do so, and [3] the plaintiff is within the class the statute intended to protect . . .[.]

*Atherton*, 115 Wn.2d at 531 (quoting *Honcoop*, 111 Wn.2d at 190). The failure to enforce exception to the public duty doctrine recognizes a duty where a public official has *actual knowledge* of an inherently dangerous and hazardous condition, is under a duty to correct the problem, and fails to do so. *Atherton*, at 531. Knowledge of a violation is not required; knowledge of facts constituting the statutory violation is sufficient. *Coffel v. Clallam Cy.*, 58 Wn. App. 517, 523, 794 P.2d 513 (1990).

■ Here, there was no allegation that the County was aware of defects in the road and drainage plans at the time it granted the development permits; instead, Pepper/Jaffe argue, county officials knew the slopes and soil on Novelty

Hill "could pose problems" for runoff and erosion. Knowledge of a potential natural hazardous condition cannot be equated with knowledge of a statutory violation or facts constituting a violation. Review of the record indicates that while the County was aware of the potential water runoff and erosion problems, it had no actual knowledge of statutory violations or of facts constituting a statutory violation.[6] Nor was evidence presented that the County approved the project knowing its design to be in violation of its code or that the contractor would not implement the project in accordance with the code requirements. Actual knowledge of inherently dangerous and hazardous conditions created by the contractor is required.[7] *Zimbelman v. Chaussee Corp.*, 55 Wn. App. 278, 283, 777 P.2d 32 (1989), *review denied*, 114 Wn.2d 1007 (1990). Thus, the failure to enforce exception to the public duty doctrine does not apply.

Special Relationship. Pepper/Jaffe next claim that a special relationship exception to the public duty doctrine existed preventing summary judgment. They argue that the County made express assurances that it would correct the drainage problems from Novelty Hill and that they justifiably relied upon those assurances.

■ "A special relationship arises where (1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) gives rise to justifiable reliance on the part of the plaintiff." *Taylor*, 111 Wn.2d at 166. The special relationship

---

[6]Although the trier of fact may have been able to find facts constituting a statutory violation given the testimony and exhibits introduced at trial, that evidence was not before the court on summary judgment. In fact the record that was before the court indicates that the County inspected the development several times and does not indicate any discrepancies were noted.

[7]Pepper/Jaffe's reference to a 1989 letter does not show actual knowledge of a code violation. In addition, since suit was instituted in 1986, this letter was irrelevant. It showed what the County may have known in 1989, but it had no such knowledge when it approved the short plat and issued the permits (1981/1982), gave final approval of the road and drainage system (1984), and accepted the road for maintenance (1985).

exception is a narrow one which requires the plaintiff to have relied on assurances he specifically sought and which the government expressly gave. *see Meaney v. Dodd*, 111 Wn.2d 174, 179-80, 759 P.2d 455 (1988) (citing *Taylor*, at 159).

Here, Jaffe admitted that he had no direct contact with county officials prior to filing his lawsuit. Pepper admitted that, other than attending a public hearing in 1978, he had no direct contact with a public official until late 1985 or 1986, shortly before he filed this suit and several years after approval of the Welcome Wood short plat. Pepper also admitted that at no time were express assurances made to him by county officials, and that he did not rely to his detriment on any such assurances. Since Pepper/Jaffe did not receive or rely on express assurances from the County, a special relationship did not exist.

█ Rescue. Pepper/Jaffe claim the County attempted to rescue them but failed to exercise due care giving rise to the rescue exception to the public duty doctrine. The rescue exception to the public duty doctrine is based on the tort theory that, "[o]ne who undertakes, albeit gratuitously, to render aid to or warn a person in danger is required by our law to exercise reasonable care in his efforts". *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 299, 545 P.2d 13 (1975). If a rescuer fails to exercise such care and consequently increases the risk of harm to those being assisted, the rescuer is liable for any physical damages caused. *Brown; Codd v. Stevens Pass, Inc.*, 45 Wn. App. 393, 403, 725 P.2d 1008 (1986), *review denied*, 107 Wn.2d 1020 (1987).

Here, there is no evidence that Pepper/Jaffe were in any physical danger. None of the complaints allege that the County had failed to rescue them from danger, that a rescue effort had increased the risk of harm, or that a county rescue attempt increased their damages. Pepper/Jaffe cite to a 1989 agreement and a 911 telephone call, events which took place $3^{1}/_{2}$ years after this lawsuit was commenced and almost 10 years after the County's alleged negligent approval of the Welcome Wood development. Pepper called 911 during a rainstorm in January 1990. There is no evi-

dence that anyone promised to rescue Pepper (the 911 operator's response that someone would respond to the call was not an express agreement by the County that it would rescue Pepper/Jaffe from their drainage problems), or that the County's response in diverting the water from the Pepper property increased the danger to Pepper, in any way. Further, this evidence was irrelevant to the issue of whether a duty was imposed on the County by its approval of the short plat, allowing the development to proceed, and the alleged nonenforcement of the KCC, as all of these events occurred prior to the suit.

■ Injunctive Relief. Pepper/Jaffe claim for the first time on appeal that the court should not have dismissed their claims for injunctive relief against King County. Failure to raise the issue before the trial court precludes Pepper/Jaffe from raising the issue on appeal. RAP 2.5(a), 9.12; *Haueter v. Cowles Pub'g Co.*, 61 Wn. App. 572, 590, 811 P.2d 231 (1991). In addition, genuine issues of material fact cannot be created by mere argumentative assertions on appeal.

[A]n adverse party may not rest upon the mere allegations or denials of his pleading, but his response . . . must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

CR 56(e); *Peterick v. State*, 22 Wn. App. 163, 181, 589 P.2d 250 (1977), *review denied*, 90 Wn.2d 1024 (1978).

■ King County's summary judgment motion specifically sought a dismissal of "all of plaintiffs' remaining claims". The remaining claims included claims couched in terms of negligence, nuisance, trespass and injunctive relief. In responding to the motion, Pepper/Jaffe did not dispute that the injunctive relief claims should be dismissed or offer any factual or legal support for those claims. The issue was not preserved. Even if the issue were preserved, it would be moot. In order to establish a legal or equitable right for purposes of injunctive relief, the party seeking the injunction must show a likelihood of success on the merits. *Tyler Pipe Indus., Inc. v. Department of Rev.*, 96 Wn.2d 785, 793-

94, 638 P.2d 1213 (1982). When all of the substantive claims against King County were dismissed, there was no longer any likelihood of success on the merits; the claim for injunctive relief was extinguished.

### Inverse Condemnation Claim Against Welcome/Backstrom

Pepper/Jaffe next claim the trial court erred in dismissing their inverse condemnation claim against Welcome. They argue that the actions of Welcome constituted a taking by inverse condemnation.

 A private party may be amenable to suit for a taking if that person acts

> under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. The Washington State Constitution, article 1, section 16 (amendment 9), requires payment of just compensation for a taking of private property pursuant to the State's sovereign power. In determining what conduct by a private individual constitutes a taking by state action, there must be a close nexus between the conduct complained of and the State, some state official or some state entity. *Tompkins v. Tinley Park*, 566 F. Supp. 70, 74 (N.D. Ill. 1983), *aff'd*, 840 F.2d 20 (7th Cir. 1988). A court may find state action if (1) the state affirmatively supported, encouraged or compelled the actionable conduct, or (2) the private party was performing a function traditionally and exclusively performed by the sovereign, or (3) the private party by his conduct became an instrumentality of state power. *Tompkins*.

Here, it is undisputed that Welcome was not a governmental entity and did not have the power of eminent domain. Under the facts of this case, the implication that the County, in enforcing its building, zoning, and land use regulations, somehow supported, encouraged or compelled the collection, diversion, and discharge of surface water, silt,

and gravel onto the Pepper/Jaffe properties is too remote. We find that in developing its property Welcome did not act as an instrumentality of government power, and did not perform an exclusively governmental function. The County did not affirmatively support, encourage or compel the building of Welcome Wood in noncompliance with its regulations. Thus, there was no taking by inverse condemnation.

## Limitation of Damages Pre-1983/1984

Pepper/Jaffe next claim the trial court improperly dismissed their claims for damages based on invasions of their property occurring more that 3 years prior to their filing suit. (Pepper, Oct. 1986; Jaffe, Aug. 1987). They argue that the statute of limitations was tolled until the construction project was completed so that they could determine the extent of their damages before filing their claims.

A cause of action accrues and the statute of limitation begins to run when the plaintiff discovers, or should have discovered, damage or injury resulting from the negligence. *Gevaart v. Metco Constr., Inc.,* 111 Wn.2d 499, 501, 760 P.2d 348 (1988). An action in tort must be commenced within 3 years of the accrual of the cause of action. RCW 4.16.080. However, actions or claims arising from the construction, alteration, repair, design, planning, survey, engineering, etc., of improvements upon real property must accrue and the statute of limitations begin to run within 6 years after substantial completion of the construction. RCW 4.16.310. "The builder limitation statute, RCW 4.16.310, creates no new right, but merely defines a limitation period within which a claim ordinarily must accrue." *Bellevue Sch. Dist. 405 v. Brazier Constr. Co.,* 103 Wn.2d 111, 118, 691 P.2d 178 (1984). The statute "enacts such a 2-step procedure: actions founded upon negligence . . . concerning improvements to real property must be filed within 2 or 3 years of discovery, depending on the type of action but, in any case, discovery must occur within 6 years of substantial completion of the improvement." *Bellevue,* at 119.

Here, Pepper/Jaffe's cause of action accrued when they discovered they had incurred substantial injury to their property caused by the flow of surface water from Novelty Hill. *Buxel v. King Cy.*, 60 Wn.2d 404, 407, 374 P.2d 250 (1962). There is no dispute that Pepper knew of this damage as early as 1978 and throughout the following years. Thus, the statute of limitations began to run as to Pepper's damages in 1978. He filed suit in October 1986; the statute had run as to damages that occurred prior to the 3 years preceding his filing suit (prior to October 1983).

 Jaffe claims it was error not to apply the discovery rule to his claims because when he should have discovered his damages was a question of fact for the jury. The statute of limitations does not begin to run until the plaintiff learns or, in the exercise of due diligence, should have learned of facts giving rise to the cause of action. *Metropolitan Servs., Inc. v. Spokane*, 32 Wn. App. 714, 720, 649 P.2d 642, *review denied*, 98 Wn.2d 1008 (1982). In an analogous case the court held that

> it would be improper to expose [defendants] to claims running back for untold years when the injury many years back may have been inconsequential and the very existence of a cause of action vague and speculative. Further, in ruling that actual and substantial damages are required, we find it proper to also require that damages claimed not extend past the 3-year period of limitations.

*Bradley v. American Smelting & Ref. Co.*, 104 Wn.2d 677, 693-94, 709 P.2d 782 (1985). Whether a plaintiff has exercised due diligence under the discovery rule is a question of fact. *Allen v. State*, 118 Wn.2d 753, 758, 826 P.2d 200 (1992). However, on summary judgment, where there are no genuine issues of material fact, the court may decide that the discovery rule does not apply. *Allen*, at 760.

Here, Jaffe admitted that Pepper had, as early as the 1981 rezone hearings, made many complaints on Jaffe's behalf concerning the Welcome Wood development. Jaffe observed water coming through the culvert by the Pepper property sometime in 1982. He also noticed "mud and so forth" washing out the road near his property on numerous occasions

beginning in 1980. This record was sufficient for the court to decide that reasonable minds could only come to the conclusion that either no actual and substantial damage had occurred, or through due diligence Jaffe should have discovered the factual basis of any cause of action which existed more than 3 years prior to his filing suit in August 1987. We find the court's ruling limiting Jaffe's claim to damages during the 3 years prior to filing suit was proper.

 Pepper/Jaffe next claim that the court erred in excluding evidence of pre-1983/1984 acts which caused damage to their property post-1983/1984, the statute of limitations period. Welcome claims that the court erred in allowing the jury to consider acts that created a harm after the act had ceased, *i.e.*, acts pre-1983/1984 creating harm post-1983/1984. A trial court's refusal to admit evidence will be reversed only upon a showing that it manifestly abused its discretion. *McConnell v. Seattle*, 44 Wn. App. 316, 326, 722 P.2d 121, *review denied*, 107 Wn.2d 1007 (1986). The 3-year statute of limitations limits the filing of claims, not the introduction of evidence of acts giving rise to those claims. RCW 4.16.080. Thus, where the claim is not barred by the statute of limitations, it is proper for a court to admit evidence of acts which caused damage.

Here, the only evidence cited by Pepper/Jaffe as not being admitted was exhibit 151,[8] and trial testimony elaborating on his and his wife's "yes" answer to a question asking if they had complained to Welcome/Backstrom. Other evidence excluded concerned pre-1983/1984 damages. The only indication that the court may have considered excluding evidence of pre-1983/1984 acts appears in the minute entry. The court denied Welcome/Backstrom's motion to dismiss the negligence claims and noted it would exclude evidence of pre-1983/1984 acts as barred by the statute of limitations. However, the court's order implementing the decision dismissed negligence claims which were based upon acts which had occurred pre-

---

[8]Minutes of a King County rezone hearing summarizing the entire zoning process for Welcome Wood, contacts between Pepper and Welcome/Backstrom, and environmental assessments.

1983/1984, but not evidence of acts causing post-1983/1984 damages. The court admitted a voluminous amount of material offered by Pepper/Jaffe concerning pre-1983/1984 events. We find no abuse of discretion in the court's allowing the jury to consider pre-1983/1984 events and acts which may have caused later damages.[9]

## Lesser-Than Rule in Limiting Damages

Pepper/Jaffe next claim that the court erred in limiting their damages to the lesser of restoration costs or the diminution in value of their properties. They argue that the proper measure of damages for injuries to land, where the land is capable of being restored to its former condition, is restoration costs. We agree.

Washington courts have consistently applied the "lesser-than" rule in fixture cases where the damaged real property is affixed to land. In those cases

> where the injury is only temporary, and the property can be restored to its original condition at a reasonable expense and at a cost less than the diminution in the value of the property, the general rule for the measure of damages is the cost of restoration.

*Burr v. Clark*, 30 Wn.2d 149, 158, 190 P.2d 769 (1948).[10] However, where the injury is to the realty itself our courts have taken another approach setting the measure of damages depending upon whether the damage was temporary or permanent. The Washington Supreme Court has stated that

> In determining what is the applicable rule for measuring damages [to land] . . ., one of the first questions is whether the

---

[9]Welcome claims that if this court concludes admission of pre-1983/1984 events was proper, it necessarily follows that dismissal of Meriweather-Leachman was improper. Since Welcome did not object to the dismissal, the project design was modified subsequent to Meriweather-Leachman's withdrawal, and Meriweather-Leachman performed no acts in connection with Welcome Wood after May 1982, we do not address this issue.

[10]*Kane v. Timm*, 11 Wn. App. 910, 527 P.2d 480 (1974); *Falcone v. Perry*, 68 Wn.2d 909, 416 P.2d 690 (1966); *James S. Black & Co. v. F.W. Woolworth Co.*, 14 Wn. App. 602, 611, 544 P.2d 112 (1975); *Fisher Properties, Inc. v. Arden-Mayfair, Inc.*, 115 Wn.2d 364, 367, 798 P.2d 799 (1990).

damage to the property is permanent, or whether the property may be restored to its original condition. If the injury is permanent, the general rule applicable is the difference between the market value of the property immediately before the damage and its market value immediately thereafter. If, however, the property may be restored to its original condition [damage is temporary] the measure of damages is the reasonable expense of such restoration, and in a proper case the loss of use or of income therefrom for a reasonable time pending such restoration.

*Colella v. King Cy.*, 72 Wn.2d 386, 393, 433 P.2d 154 (1967) (citing *Harkoff v. Whatcom Cy.*, 40 Wn.2d 147, 241 P.2d 932 (1952)); *Olson v. King Cy.*, 71 Wn.2d 279, 293, 428 P.2d 562, 24 A.L.R.3d 950 (1967).[11] Thus, in Washington the proper measure of damages to the land itself turns upon whether the damage is temporary or permanent. If the damage is temporary, the land can be restored to its prior condition and the measure of the damages is the reasonable cost of restoration and loss of use during the restoration. If the damage is permanent, incapable of restoration, the measure of damages is the diminution in value of the land.[12]

Here, the jury found that the damage was temporary and the properties could be restored to their prior condition. Because the damage was to the realty itself and was temporary, the trial court erred in limiting the recovery to the lesser of restoration costs or diminution in value.

Welcome claims that the trial court erred in allowing the jury to determine that the damages were temporary. They argue that the injuries to Pepper/Jaffe's land are likely to recur, and thus the evidence does not support a finding that the damages are temporary.

Whether damages are temporary or permanent is a question of fact. *Barci v. Intalco Aluminum Corp.*, 11 Wn. App. 342, 355, 522 P.2d 1159, *review denied*, 84 Wn.2d 1012

---

[11]These cases involved facts similar to those here — the discharge of surface water onto adjoining property with the resulting accumulation of debris.

[12]For purposes of clarity, we note that the "lesser-than" rule is alive and well as applied to fixture cases, such as fences, buildings, etc., but not in cases where the injuries are to the land itself.

(1974). A jury's factual finding will not be reversed on appeal if it was supported by substantial evidence, evidence of sufficient quantum to persuade a fair-minded person of the truth of the declared premise. *Lillig v. Becton-Dickinson*, 105 Wn.2d 653, 658, 717 P.2d 1371 (1986). We do not agree with Welcome's contention that the jury's finding was not supported by substantial evidence. Here, there was abundant evidence on the nature of the damage, silt, debris, and gravel deposited on the Pepper/Jaffe properties. Deposits such as these can be removed. Welcome has not adequately supported their claim of insufficient evidence. In reviewing this record, we find substantial evidence in support of the jury's determination that the damage to the Pepper/Jaffe properties is temporary.[13]

## Reasonableness

Welcome claims that the cost to restore the Pepper/Jaffe properties is unreasonable when compared to the diminution in value of the properties.[14] Welcome has not assigned error to the jury's finding of the cost of restoring the properties to their previous condition, thus, those findings are verities on appeal. *Metropolitian Park Dist. v. Griffith*, 106 Wn.2d 425, 433, 723 P.2d 1093 (1986). The challenge here is to the award of those damages as a matter of law.

The goal of awarding damages is to fully compensate the plaintiff for loss or injury. One should not recover any windfall in the award of damages, but should receive an award which does no more than put the plaintiff in his or her rightful position. 1 Dan B. Dobbs, *Remedies* § 3.1, at 280 (2d

---

[13]We note from oral argument that the culvert which caused the problem in 1990 was repaired by the County and no evidence of any further problems was submitted by either side.

[14]Welcome cites *Grant v. Leith*, 67 Wn.2d 234, 235, 407 P.2d 157 (1965) for the proposition that "[i]n the event the cost of restoration is in excess of the value of the property before the slide, or otherwise prohibitive, then the measure of damages is the difference in market value before and after the taking or invasion." *Grant*, at 235. The *Grant* court was stating the lesser-than rule as it applies to fixtures and permanent damages, which is not the case here. *Grant; Colella*, 72 Wn.2d at 393.

ed. 1993); *Aker Verdal A/S v. Neil F. Lampson, Inc.*, 65 Wn. App. 177, 183, 828 P.2d 610 (1992) (the guiding principle of tort law is to make the injured party as whole as possible through pecuniary compensation) (citing *DeNike v. Mowery*, 69 Wn.2d 357, 371, 418 P.2d 1010, 422 P.2d 328 (1966)). The fact that the cost of restoring property to its prior condition exceeds the amount by which the land's value has been diminished does not necessarily make those repair costs unreasonable. Restatement (Second) of Torts § 929 (1979); *cf. Grant v. Leith*, 67 Wn.2d 234, 235, 407 P.2d 157 (1965); *Falcone v. Perry*, 68 Wn.2d 909, 416 P.2d 690 (1966) ($4,000 cost to repair a house was allowed as against an "economic" decrease in land value of only $400).[15]

> To limit repair costs to diminution in value is to either force a landowner to sell property he wishes to keep or to make repairs partly out of his own pocket.

Dan B. Dobbs, *Remedies* § 5.1, at 317 (1973). In *Myers v. Arnold*, 83 Ill. App. 3d 1, 7, 403 N.E.2d 316, 321 (1980), the court reasoned:

> the harm may be corrected with a reasonable expenditure even though the expenditure exceeds the amount the land has diminished in value. In the latter case, the full repair cost will come much closer to restoring what was actually lost . . ..

However, reasonable repair costs cannot be without limits. We agree with other jurisdictions that hold the plaintiff may recover cost of repairs in excess of the diminished value of the property, so long as the repair costs are less than the total preinjury value of the property.[16] It would be

---

[15]Other courts award restoration costs exceeding diminution in value where defendants' actions injured an interest in, or aspect of, a plaintiff's land that was unique or had peculiar personal value. *see, e.g., Roman Catholic Church of Archdiocese v. Louisiana Gas Serv. Co.*, 618 So. 2d 874, 877-80 (La. 1993); *Moulton v. Groveton Papers Co.*, 114 N.H. 505, 512-13, 323 A.2d 906, 911 (1974); *Regal Constr. Co. v. West Lanham Hills Citizen's Ass'n*, 256 Md. 302, 305, 260 A.2d 82, 84 (1970).

[16]In some jurisdictions that have not adopted the "lesser-than" rule, damages for injuries to real property are limited to the pretort value of the injured property. *E.g., Southern Ind. Gas & Elec. Co. v. Indiana Ins. Co.*, 178 Ind. App. 505, 517, 383 N.E.2d 387 (1978); *cf. "L" Invs., Ltd. v. Lynch*, 212 Neb. 319, 322

anomalous for the plaintiff to recover more in damages than he could recover for complete destruction of the property.[17] We find the trial court's pretrial order limiting damages to the pretort value of the Plaintiff's properties was proper. In addition, where, as here, there is evidence in the record supporting the jury's finding of the cost to restore, those costs are undisputed, and the court limits damages to the pretort value of the properties, we cannot say that those repair costs are unreasonable.

## Range of Evidence Presented at Trial

Welcome next claims the damages awarded were in error because they were beyond the range of the evidence. They argue expert testimony indicated 77 percent of Pepper's and 81 percent of Jaffe's damages were caused by Welcome Wood activities and the court should have limited the recovery to those percentages.

■ ■ An appellate court will generally not disturb a jury's verdict on damages if it is within the range of the evidence presented at trial. *Steele v. Queen City Broadcasting Co.*, 54 Wn.2d 402, 409, 341 P.2d 499 (1959). However, reversal is appropriate where the damage award is so disproportionate as to indicate that it resulted from passion or prejudice. *Wooldridge v. Woolett*, 96 Wn.2d 659, 688, 638 P.2d 566 (1981). The basis of contribution between persons who are liable for damages is comparative fault. RCW 4.22.040. The jury determines the percentage of total fault attributable to every entity, not whether the defendant caused a certain percentage of the plaintiff's damages. RCW 4.22.070. Expert

---

N.W.2d 651 (1982); *cf. Ratner v. Willametz*, 9 Conn. App. 565, 586, 520 A.2d 621, 633 (1987) ("cost of repairs may *not* be considered by the trial court as a measure of diminution in value when the cost of repairing the damage exceeds the former value of the property").

[17] In contrast, some jurisdictions employing the "lesser-than" rule limit damages to the pretort value of the land because diminution in value can never exceed the value prior to the injury. In at least some jurisdictions restoration costs are also permitted even though they exceed the decrease in market value if there is a reason, personal to the owner, for restoring the condition. *Heninger v. Dunn*, 101 Cal. App. 3d 858, 162 Cal. Rptr. 104 (1980).

testimony assists the jury in evaluating fault; however, it is for the jury to determine the weight of the testimony, not the expert. *see Fraser v. Beutel,* 56 Wn. App. 725, 734, 785 P.2d 470, *review denied,* 114 Wn.2d 1025 (1990).

Here, the jury attributed fault as follows: 30 percent J.J. Welcome, 60 percent Welcome, and 10 percent to other non-parties. The court instructed the jury that if its "verdict [was] for one or more of the plaintiffs, then you must determine the amount of money which will reasonably and fairly compensate that plaintiff for such damages as you find were proximately caused by any negligence of a defendant." The jury determined the fair market value of the properties before and after the damage and the reasonable cost to restore the properties to their predamage condition. Given that each Defendant's percentage of comparative fault was well below the percentage attributed to Welcome Wood by the expert, the finding is within the range of the evidence. Moreover, there was no obvious disproportionality in the jury's determination indicating that it might have resulted from passion or prejudice.

### Dismissal of Claims for Nuisance and Trespass

Pepper/Jaffe next claim that since a plaintiff may simultaneously allege actions in negligence, nuisance, and trespass, these claims should have gone to the jury.

A party's characterization of the theory of recovery is not binding on the court. It is the nature of the claim that controls. *see New York Underwriters Ins. Co. v. Doty,* 58 Wn. App. 546, 794 P.2d 521 (1990); *Boyles v. Kennewick,* 62 Wn. App. 174, 813 P.2d 178, *review denied,* 118 Wn.2d 1006 (1991). "[T]hree separate legal theories based upon one set of facts, constitute one 'claim for relief' under CR 54(b)." *Snyder v. State,* 19 Wn. App. 631, 635, 577 P.2d 160 (1978). For purposes of CR 54(b), a single claim for relief, on one set of facts, is not converted into multiple claims by the assertion of various legal theories. *Doerflinger v. New York Life Ins. Co.,* 88 Wn.2d 878, 881-82, 567 P.2d 230 (1977). "In

Washington a 'negligence claim presented in the garb of nuisance' need not be considered apart from the negligence claim." *Atherton*, 115 Wn.2d at 527.

Here, the negligence, nuisance, and trespass claims all stemmed from a single set of facts, *i.e.*, the mud, gravel, and silt being deposited on the Plaintiff's property. Essentially, Pepper/Jaffe had a single negligence claim with multiple theories.

■ Additionally, the trial court also dismissed the intentional nuisance and trespass claims for insufficient evidence. In tort law, intent denotes that the person acted with a desire to cause the consequences of his conduct or believes that the consequence is substantially certain to result. *Bradley*, 104 Wn.2d at 682-84. Pepper/Jaffe presented no evidence that Welcome intended or was substantially certain that mud, gravel, and silt would be deposited on their properties. In fact there was evidence to the contrary. The only intent shown, on Welcome's part, was that of developing the Welcome Wood property and accomplishing activities to that end.

### Dismissal of the Emotional Distress Claims

Pepper claims that his emotional distress claims should have been submitted to the jury. He argues that intent can be inferred from the continuing nature of his damages and Welcome's volitional acts in developing Novelty Hill. He also argues there was sufficient evidence as to whether he exhibited objective symptoms to take the issue of negligent infliction of emotional distress to the jury.

■■ Washington recognizes that damage for inconvenience, discomfort and mental anguish may result from intentional interference with property interests. *Schwarzman v. Association of Apartment Owners*, 33 Wn. App. 397, 404, 655 P.2d 1177 (1982). "Such interference, however, must be more than 'incidental.' . . . A party is not liable for damages for emotional distress when it had a legal right to act as it did." *Schwarzman*, at 404. A verdict cannot be founded on

mere theory or speculation. If there is nothing more tangible to proceed upon than two or more equally reasonable inferences from a set of facts, and under only one of the inferences would the defendant be liable, a jury will not be allowed to resort to conjecture to determine facts. *Schmidt v. Pioneer United Dairies*, 60 Wn.2d 271, 276, 373 P.2d 764 (1962).

Here, there was insufficient evidence that Welcome or J.J. Welcome Construction Company acted with a desire to cause Pepper/Jaffe's damages. In fact, there was evidence to the contrary. The road and drainage system were constructed, and measures were taken to prevent landslide and erosion problems in compliance with the county code. Thus, there was insufficient circumstantial evidence of intent to take the issue to the jury. The trial court properly dismissed the claim for intentional infliction of emotional distress.

Pepper also claims damages for negligent infliction of emotional distress. "The element of foreseeability plays a large part in determining the scope of a defendant's duty." *Hunsley v. Giard*, 87 Wn.2d 424, 435, 553 P.2d 1906 (1976). Negligence theory requires foreseeable risk, threatened danger, and unreasonable conduct in light of the danger. *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89 Wn.2d 959, 962, 577 P.2d 580 (1978).

Pepper has not demonstrated how Welcome's developing their property was unreasonable or that his damage was foreseeable, especially in light of the County approving the development and issuing the proper permits. The summary judgment was proper since there were no disputed issues of fact on the reasonableness of Welcome's activity in developing property or the foreseeability of Pepper/Jaffe's damage. Since the court did not get past the duty/breach elements, there was no need to address causation.

Additionally, objective symptoms are required to support a finding of liability in a claim for negligent infliction of emotional distress. *Nord v. Shoreline Sav. Ass'n*, 116 Wn.2d 477, 485, 805 P.2d 800 (1991). Pepper admitted that he had

not seen a psychologist, psychiatrist, or social worker and had not taken any medication for emotional distress. The only indication that he had any objective symptoms was a doctor's report of an August 14, 1989, visit, $2^1/2$ years after he filed suit, indicating stress from the ongoing lawsuit. There was no indication of any prior emotional distress (Oct. 1983-Aug. 1989). The trial court's decision indicates that it gave thorough consideration to all the facts and found no genuine issue of material fact. We find no error.

## Tort Reform Act

Finally, Pepper/Jaffe claim that the trial court erred in refusing to declare RCW 4.22.070 partially unconstitutional. They argue that the provision of the act modifying joint and several liability is unconstitutional, citing fundamental provisions of Washington tort law, equal protection, substantive and procedural due process, right of access to the courts, and the doctrine of separation of powers.

We decline to review this issue. When a "statute . . . is alleged to be unconstitutional, the attorney general shall also be served with a copy of the proceeding and be entitled to be heard." RCW 7.24.110. Approximately 4 weeks into the trial, Pepper/Jaffe challenged the constitutionality of the statute. Despite assertions that the Attorney General would be served, Pepper/Jaffe have not shown that the Attorney General has been served or given an opportunity to be heard. Pepper/Jaffe cite their having raised the issue at trial as preserving the issue for review. However, because a copy of the challenge was not served upon the Attorney General as required by RCW 7.24.110, the jurisdiction of the court was not invoked to obtain the requested declaratory relief. *Kendall v. Douglas, Grant, Lincoln, & Okanogan Cys. Pub. Hosp. Dist. 6*, 118 Wn.2d 1, 11-12, 820 P.2d 497 (1991).

We remand for computation of damages using restoration costs as the measure of damages, not exceeding the pretort value of the properties; in all other respects the judgment of

550

the trial court is affirmed. The parties will bear their own attorneys' fees on appeal.

GROSSE and AGID, JJ., concur.

Review denied at 124 Wn.2d 1029 (1994).