IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| REBECCA THORLEY and MONICA BAXTER, | ) ) | No. 39450-6-III |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | PUBLISHED OPINION |
| DONALD E. NOWLIN; marital | ) | |
| community or domestic partnership of | ) | |
| DONALD E. NOWLIN and HANNA | ) | |
| NOWLIN; OUTWEST LIFESTOCK; and | ) | |
| DOES 1 -10 | ) | |
| | ) | |
| Respondents. | ) | |

FEARING, C.J. — Rebecca Thorley and Monica Baxter sue Donald Nowlin as a result of the sale and subsequent death of stallion Brad Pitt. Brad Pitt died while being boarded by Nowlin and after Nowlin's sale of the horse to Thorley and Baxter. In this interlocutory review, we hold that a claimant may recover emotional distress damages under RCW 4.24.320, the theft of livestock act (TOLA), but rule that a claimant cannot recover for emotional distress under a claim for breach of contract or bailment. We also rule that Washington Constitution, article I, section 21 guarantees a jury trial for a party to a private action for damages under the Consumer Protection Act (CPA), ch. 19.86 RCW.

FACTS

The pending dispute between Rebecca Thorley and Monica Baxter, on the one hand, and Donald Nowlin, on the other hand, arises from the purchase by Thorley and Baxter from Nowlin of twenty-year-old stallion Brad Pitt and the death of the stallion days later while boarded by Nowlin. The appeal asks us to determine under what, if any, cause of actions Thorley and Baxter may recover noneconomic damages because of the death of their horse and whether Thorley and Baxter are entitled to a jury trial on a CPA claim wherein they seek damages and equitable relief. We take the facts from declarations filed by the three parties and expert witnesses in support of and in opposition to motions.

Appellants Rebecca Thorley and Monica Baxter befriended one another because of a common devotion to animal rights. Thorley spent years of her life protesting the live animal export trade in the United Kingdom. Baxter has rescued thoroughbred horses and educated the public about slaughter-bound horses.

Donald Nowlin maintained a feedlot in Sunnyside, where he kept and sold horses. Some of the horses he sold for slaughter. According to Nowlin, a feedlot serves as the last stop before the slaughterhouse for old, untrained, lame, unwanted, or problematic horses whose owners no longer wish to care for them. One horse present on the premises was an old former thoroughbred stud, later named Brad Pitt, that Nowlin purchased, on

May 26, 2016, at a public auction after no one else bid on him. Nowlin priced the stallion at $250 based on its meat value and the feed and shipping costs he had incurred.

Sabrina Connaughton, a Facebook friend to Rebecca Thorley and Monica Baxter, arranged for the two to meet Donald Nowlin, on July 28, 2016 at Nowlin's Sunnyside quarters, to discuss the purchase of horses Nowlin housed on the lot. Connaughton worked with Nowlin.

According to Rebecca Thorley and Monica Baxter, the duo arrived at Donald Nowlin's property around noon on July 28, when the temperature was 106 degrees F. The animals on the property lacked shelter. Thorley and Baxter observed that Nowlin's horses bore injuries, such as fist-size scabby wounds, overgrown hooves, cracked hooves, and coughs. A pregnant mare bled from her vagina. Another horse suffered from a broken leg. Troughs held contaminated water. Thorley saw, next to Nowlin's property, an arena for Mexican rodeos.

The twenty-year-old stallion, who Rebecca Thorley and Monica Baxter named "Brad Pitt," caught the two women's attention. Clerk's Papers (CP) at 82. According to Thorley and Baxter, Donald Nowlin informed them that he deemed the stallion the "mascot" of his feedlot. CP at 3. He intended to donate Brad Pitt to the adjoining Mexican rodeo for an event called "smoking." CP at 3. During a smoking, cowboys load horses into a chute and force the horses from the chute with their legs tied together. The

3

activity causes the horses to stumble, which some observers deem funny. Nowlin denies telling the two women that he intended to loan the horse for a rodeo.

Donald Nowlin, on the one hand, and Rebecca Thorley and Monica Baxter, on the other hand, disagree as to the day that the two women purchased Brad Pitt. Nowlin identifies the day as July 28, the day that Thorley and Baxter visited Nowlin's premises. According to Thorley and Baxter, the purchase occurred on August 10, twelve days later.

Donald Nowlin testified to being surprised that Rebecca Thorley and Monica Baxter held interest in the stallion, who was ungelded and in terrible condition. Brad Pitt constantly paced and aggressively approached mares in order to mate. According to Nowlin, Thorley and Baxter commented about the poor health of Brad Pitt and expressed the intent to euthanize the horse if no one adopted him.

According to Donald Nowlin, Rebecca Thorley and Monica Baxter purchased Brad Pitt "as-is." He gave no warranties on how long the horse would live. The parties did not sign any contract.

Donald Nowlin testified that Rebecca Thorley and Monica Baxter asked that he continue to house and feed Brad Pitt until they found someone to adopt him. Nowlin responded that his feedlot functioned as a temporary holding facility pending shipment for slaughter and he did not permit storage on the premises for more than thirty days. He added that no one monitored the horses in his absence from the feedlot. Nowlin informed the two ladies that he charged $5 a day for feed for the first seven days and $10 per day

thereafter until the thirty days ended.  According to Nowlin, Thorley and Baxter agreed that, if they did not retrieve Brad Pitt within thirty days, ownership of the horse would return to Nowlin without any refund of the purchase price, because of the feed costs in the interim.  Thorley and Baxter do not concede that they agreed to retrieve Brad Pitt within thirty days, with the penalty of ownership reverting to Nowlin.

According to Rebecca Thorley and Monica Baxter, the two, on August 10, 2016, purchased Brad Pitt and six other horses from Donald Nowlin for a total of $2,350.  Sabrina Connaughton informed the two buyers that they could leave the horses at the feedlot for $5 per day before taking possession.

According to Monica Baxter, on August 21, 2016, she gave Donald Nowlin her permission, via text message, to board Brad Pitt on the feedlot.  Nowlin did not reply.  Baxter testified that she later called Nowlin and Nowlin agreed to board Brad Pitt for $10 per day.  Meanwhile, another facility agreed to board Brad Pitt, but could not do so until September 24, 2016.  On September 5, Baxter sent Nowlin a text message informing him that she and Rebecca Thorley would remove Brad Pitt from the feedlot on September 24.  Nowlin did not respond.

Donald Nowlin testified that, when he left his feedlot, on the evening of September 6, 2016, Brad Pitt was well.  When Nowlin returned the following morning, Brad Pitt laid dead in the feedlot.  Nowlin operated a forklift to move the stallion from his pen to an area where the public could not see him.

On September 7, 2016, Sabrina Connaughton called Rebecca Thorley and told Thorley that the feedlot shot and killed Brad Pitt because he suffered a broken leg. According to Monica Baxter, who presumably learned of the death from Thorley, Baxter thereafter called Donald Nowlin and asked him to explain the death of Brad Pitt. Nowlin responded that he was not present when the horse broke his back leg. He added that he administered a "cocktail" that euthanized Brad Pitt. CP at 7. Baxter asked Nowlin how he knew Brad Pitt broke his leg. Nowlin explained that he saw the stallion standing in the middle of the pen holding up his leg. According to Nowlin, the leg was swollen and looked broken. Nowlin added that he did not wish anyone to see an injured horse on his lot.

During Monica Baxter's September 7 phone conversation with Donald Nowlin, Baxter asked Nowlin if the latter retained Brad Pitt's body. According to Baxter, Nowlin grew agitated and remarked that he deposited the horse's body in the bushes to shield his presence from customers purchasing horses. Nowlin asked Baxter if she wished to see photographs of Brad Pitt. Baxter asked for pictures.

Donald Nowlin agrees that he engaged in a September 7 conversation with Monica Baxter. He denies that he told Baxter that he administered drugs for the purpose of euthanasia. Baxter took the news well because of the age and condition of Brad Pitt.

Donald Nowlin texted Monica Baxter two pictures of Brad Pitt: one of the horse's injured leg and another of the horse lying dead. The first pictured depicted the injured

6

leg's hock as swollen and with a draining puncture wound. The second image showed

blood oozing from Brad Pitt's eyes and nose. The entire corpus displayed gashes and

other injuries.

Rebecca Thorley and Monica Baxter insist that Donald Nowlin did not inform

them of any injury to Brad Pitt before Nowlin killed the stallion. Nowlin did not ask

permission for the purported euthanasia.

On September 8, Monica Baxter and Rebecca Thorley journeyed to Donald

Nowlin's feedlot to retrieve Brad Pitt's corpse. According to Nowlin, the two women

then asked to trade a donkey for Brad Pitt. Nowlin did not suggest that he told the

women that the ownership of Brad Pitt had reverted to him because of the passage of

thirty days. Nowlin operated a forklift to lift Brad Pitt's body, and he deposited the body

into a van. Nowlin testified to the difficulty in loading and moving a bloated and

ballooned 1,000-pound horse. According to Nowlin, he did not charge the ladies for

boarding Brad Pitt, and the two thanked him for his generosity.

Rebecca Thorley and Monica Baxter's hired veterinarians Victoria Smith and Sean

Tuley to examine the corpus of Brad Pitt. Both veterinarians submitted declarations in

opposition to a summary judgment motion brought by Donald Nowlin. Dr. Smith

averred:

> The actual cause of death to Brad Pitt was spinal cord trauma and a
> luxation in the cervical C6-C7 region of the neck, with an 8 cm hematoma,
> caused by tearing of the blood vessels. This is also an unusual injury, most

commonly seen with rotational falls at high speed, or when a horse rears up on the hind legs and flips over backwards. The anatomy of the neck at the level of C6-C7 has massive muscles and is deeply cushioned, requiring severe blunt force to luxate the joint.

CP at 69. Dr. Tuley declared:

Brad Pitt was most likely hopped up on performance-enhancing drugs (i.e., Methamphetamine and Phen Phen), match raced, tripped, and used for brutal rodeo events. In his fit of rage and excitement, something catastrophic occurred, causing him to rear back, cut his lip on the war bridle, and flip over backward breaking his neck. Alternatively, he may have been involved in a high-speed collision with another horse or a wall. One thing is certain: he suffered an extraordinarily forceful impact. Once on the ground suffering from the broken spine, he may have been injected with 4-methylphenol.

CP at 93.

Donald Nowlin denies causing any injury to Brad Pitt or injecting him with any euthanistic medications. Nowlin testified that, weeks before the death, he orally administered butte, a pain reliever, and penicillin, through an injection, for Brad Pitt's bad leg. He denied administering other drugs to the horse. According to Nowlin, Brad Pitt suffered the injury to the leg when he and another horse fought. Nowlin speculated that an "unknown perpetrator" stealthily entered the feedlot and took Brad Pitt to the rodeo. CP at 239.

## PROCEDURE

Rebecca Thorley and Monica Baxter sued Donald Nowlin for trespass to livestock under RCW 4.24.320, breach of bailment, outrage, conversion, breach of contract, and

8

CPA violations. Thorley and Baxter's prayer for relief sought damages for the value of Brad Pitt, travel expenses, hauling expenses, veterinary expenses, noneconomic damages, and treble damages under the trespass of livestock act (TOLA) and the CPA. We presume noneconomic damages include recovery for emotional distress. Thorley and Baxter specifically alleged that unfair and deceptive acts and practices entitled them to actual damages, treble damages, reasonable attorney fees and costs, and injunctive relief.

In their complaint, Rebecca Thorley and Monica Baxter sought an injunction enjoining Donald Nowlin from:

> i. From possessing or using controlled substances used to humanely euthanize a nonhuman animal without proper registrations, licenses, and permits;
> ii. From engaging in or causing others to engage in acts of animal cruelty under federal, State, and local law, including but not limited to Ch. 16.52 RCW;
> iii. From failing to clearly and conspicuously, in writing, disclose all terms and conditions related to selling, leasing, and boarding of any animals;
> iv. From performing veterinary medicine without a license in violation of RCW 18.92.240;
> v. From misappropriating and misusing animals sold by Nowlin to others;
> vi. From failing to properly quarantine sick animals to prevent them from infecting other animals boarded and purchased at his premises;
> vii. From misrepresenting to potential buyers the presence or absence of disease on his property, including but not limited to strangles;
> viii. From misrepresenting to buyers, directly or by implication, the health or condition of an animal; [and]
> ix. From failing to promptly provide breed registry papers on sold horses to buyers at time of sale, such as those from the Jockey Club[.]

x. From engaging in other deceptive and/or unfair practices as the court deems appropriate and to amend to conform to evidence as presented at trial.

CP at 11-12.

Donald Nowlin filed a jury demand. He did not limit his request for a jury to particular causes of action plead by Rebecca Thorley and Monica Baxter.

Donald Nowlin filed a motion for summary judgment to dismiss all claims raised by Rebecca Thorley and Monica Baxter. The superior court conducted a hearing on Donald Nowlin's summary judgment motion on May 24, 2017. At the conclusion of the hearing, the superior court held that Thorley and Baxter could not recover emotional distress damages as a matter of law under RCW 4.24.320, breach of bailment, breach of contract, or the CPA, RCW 19.86.090. The court, however, volunteered that he would revisit his ruling if Thorley and Baxter submitted legal authority establishing that the TOLA authorized general damages recovery. The superior court did not rule on whether a claimant could recover emotional distress damages on a conversion cause of action. The court's ruling only limited the type of damages that could be recovered and did not dismiss any particular cause of action.

After reviewing the additional authorities presented by Rebecca Thorley and Monica Baxter, the superior court revisited his May decision. The TOLA, RCW 4.24.320, lists alternative ways by which one may violate the statute based on violations of other statutes, RCW 9A.56.080 and RCW 9A.56.083, RCW 16.52.205, or

RCW 16.52.320. On July 21, 2017, the court entered an order denying Donald Nowlin's motion for summary judgment regarding the TOLA claims based on RCW 16.52.205 and RCW 16.52.320, breach of bailment, conversion, breach of contract, and violation of the CPA. The court granted summary judgment with respect to Thorley and Baxter's TOLA claims based on RCW 9A.56.080 and RCW 9A.56.083 and dismissed these alternative methods of violating RCW 4.24.320. The superior court also ruled that Thorley and Baxter could not recover emotional damages under the theories of breach of contract, breach of bailment, and violation of the CPA.

The superior court later requested briefing on whether Rebecca Thorley and Monica Baxter could recover emotional distress damages under RCW 4.24.320, the TOLA, and the tort of conversion. On December 19, 2022, the court entered an order that denied any recovery for emotional distress damages under all causes of action. The superior court order may have dismissed the claim under RCW 4.24.320 altogether based on the reasoning that "livestock" within the meaning of TOLA means chattel to which people do not become emotionally attached.

On December 19, 2022, the court also entered an order denying a jury trial for the consumer protection claim. The order read:

> Neither party is entitled to a trial by jury on the Consumer Protection Act claim, although the Court reserves the right to allow that claim to be heard by the jury if other claims will be decided by a jury.

CP at 202. The superior court certified the case for immediate appeal despite pending claims because it wished this court to decide, before any trial, the extent, if any, to which Thorley and Baxter may recover emotional distress.

## LAW AND ANALYSIS

### Emotional Distress Damages

We must first decide whether Rebecca Thorley and Monica Baxter may recover emotional distress damages under any of their causes of action. The two assert that they may recover such noneconomic damages under TOLA, conversion, breach of bailment, and breach of contract. The CPA does not allow recovery for emotional distress, and Thorley and Baxter do not argue to the contrary. *Washington State Physicians Insurance Exchange & Association v. Fisons Corp.*, 122 Wn.2d 299, 858 P.2d 1054 (1993).

Donald Nowlin characterizes Brad Pitt's death as a mercy euthanasia of an already injured and unavoidably dying, ungelded and unwanted, ancient stallion. Nowlin emphasizes that Rebecca Thorley and Monica Baxter could not have bonded with Brad Pitt because they only saw him from a distance for a half hour and left him at the feedlot. Thorley and Baxter's facts, including expert opinions, conflict with Nowlin's portrayal. Since the superior court dismissed the claim for emotional distress recovery on summary judgment, we view the facts in the light favorable to Thorley and Baxter. *Pearson v. Department of Labor & Industries*, 164 Wn. App. 426, 431, 262 P.3d 837 (2011).

*TOLA*

We agree with Rebecca Thorley and Monica Baxter that they may recover emotional damages under RCW 4.24.320, the trespass of livestock act. In our analysis, we pursue two distinct lines of analysis, which we label the intentional tort route and the statutory interpretation course. Both lines favor Thorley and Baxter.

First, we review damage rules for intentional torts. A hundred-year succession of Washington cases supports damages for emotional distress arising from intentional torts. *Birchler v. Castello Land Co.*, 133 Wn.2d 106, 117, 942 P.2d 968 (1997). Damages for inconvenience, discomfort and mental anguish, if proved, may be recovered for intentional interference with property interests. *Birchler v. Castello Land Co.*, 133 Wn.2d 106, 117 (1997); *Lavington v. Hillier*, 22 Wn. App. 2d 134, 152, 510 P.3d 373 (2022), *review denied*, 200 Wn.2d 1010, 518 P.3d 212 (2022); *Pepper v. J.J. Welcome Construction Co.*, 73 Wn. App. 523, 547, 871 P.2d 601 (1994), *abrogated by*, *Phillips v. King County*, 87 Wn. App. 468, 943 P.2d 306 (1977).

In *Birchler v. Castello Land Co.*, 133 Wn.2d 106 (1997), property owners sued for trespass resulting from a neighbor and the neighbor's contractor intentionally encroaching on the claimant's land during a grading and filling operation. The trespass caused destruction of a fence and removal of vegetation. The property owners sued for recovery under RCW 64.12.030, which addressed damage to trees and shrubbery. The statute still reads today:

> Whenever any person shall cut down, girdle, or otherwise injure, or carry off any tree, . . . , timber, or shrub on the land of another person . . . , without lawful authority, in an action by the person . . . against the person committing the trespasses or any of them, any judgment for the plaintiff shall be for treble the amount of damages claimed or assessed.

RCW 64.12.040 allowed the defendant to escape triple damages if the trespass was casual or involuntary. The neighbor and its contractor appealed an award to the property owners for emotional distress. The two defendants argued the timber trespass statute did not afford recovery for emotional distress.

The Washington Supreme Court, in *Birchler v. Castello Land Co.*, held that the claimants may recover emotional distress damages under RCW 64.12.030. The court disagreed with the defendants' argument that, since the statute made no mention of emotional distress damages, the legislature intended to exclude such recovery. Because of the treble damages feature of the trespass statute, the court recognized a punitive purpose behind the act but did not rest its decision on this ground. The court noted that trespass constitutes an intentional tort. The Supreme Court had liberally construed damages for emotional distress as being available merely on proof of an intentional tort.

Washington cases redressing injury to animals follow the rule permitting emotional distress damages for intentional torts. In Washington, a pet owner, under common law, has no right to emotional distress damages or damages for loss of human-animal bond based on the negligent death or injury to a pet. *Repin v. State*, 198 Wn. App.

14

243, 265, 392 P.3d 1174 (2017); *Hendrickson v. Tender Care Animal Hospital Corp.*, 176 Wn. App. 757, 762, 312 P.3d 52 (2013); *Sherman v. Kissinger*, 146 Wn. App. 855, 873, 195 P.3d 539 (2008). Nevertheless, this court held in *Womack v. Rardon*, 133 Wn. App. 254, 263, 135 P.3d 542 (2006) that malicious injury to an animal can support a claim for emotional distress damages.

With these common law rules in the background, we summarize RCW 4.24.320. We will dissect the statute and its incorporated statutes later. In short, RCW 4.24.320 prohibits willfully or intentionally withholding, stealing, killing, or causing substantial physical harm to another's animal. Thus, the statute codifies conversion and trespass principles. Under our intentional tort avenue of analysis, Rebecca Thorley and Monica Baxter may recover emotional distress damages.

We move to the statutory interpretation course. In doing so, we adopt our sister division's recent astute analysis in *Beasley v. GEICO General Insurance Co.*, 23 Wn. App. 2d 641, 658, 517 P.3d 500 (2022), *review denied*, 200 Wn.2d 1028, 523 P.3d 1188 (2023).

TOLA, RCW 4.24.320, declares:

> Any person whose livestock is damaged as a result of actions described in *RCW 16.52.205* or any owner of livestock who suffers damage as a result of *a willful, unauthorized act described in RCW 9A.56.080, 9A.56.083, or 16.52.320* may bring an action against the person or persons committing the act in a court of competent jurisdiction for exemplary damages up to three times the *actual damages* sustained, plus attorney's

15

fees. As used in this section, "livestock" means the animals specified in RCW 9A.56.080 and 16.52.011.

(Emphasis added.) RCW 9A.56.080(1) defines "livestock" as "any horse, mule, cow, heifer, bull, steer, swine, goat, or sheep." RCW 16.52.011(2)(j) also provides that "'livestock' includes, but is not limited to, horses, mules, cattle, sheep, swine, goats, and bison."

A predicate to a violation of RCW 4.24.320 is the violation of one of four separate statutes: RCW 9A.56.080, 9A.56.083, 16.52.205, or 16.52.320. RCW 9A.56.080(1) declares:

> Every person who, with intent to sell or exchange and to deprive or defraud the lawful owner thereof, willfully takes, leads, or transports away, conceals, withholds, slaughters, or otherwise appropriates any horse, mule, cow, heifer, bull, steer, swine, goat, or sheep is guilty of theft of livestock in the first degree.

RCW 9A.56.083 reads:

> A person who commits what would otherwise be theft of livestock in the first degree but without intent to sell or exchange, and for the person's own use only, is guilty of theft of livestock in the second degree.

The lengthy RCW 16.52.205 provides, in part:

> (1) A person is guilty of animal cruelty in the first degree when, except as authorized in law, he or she intentionally (a) inflicts substantial pain on, (b) causes physical injury to, or (c) kills an animal by a means causing undue suffering or while manifesting an extreme indifference to life, or forces a minor to inflict unnecessary pain, injury, or death on an animal.
> (2)(a) A person is guilty of animal cruelty in the first degree when, except as authorized by law or as provided in (c) of this subsection, he or

16

she, with criminal negligence, starves, dehydrates, or suffocates an animal, or exposes an animal to excessive heat or cold and as a result causes: (i) Substantial and unjustifiable physical pain that extends for a period sufficient to cause considerable suffering; or (ii) death.

Finally, RCW 16.52.320 declares:

(1) It is unlawful for a person to, with malice, kill or cause substantial bodily harm to livestock belonging to another person.
(2) A violation of this section constitutes a class C felony.

We parse RCW 4.24.320, RCW 9A.56.080, RCW 9A.56.083, RCW 16.52.205, and RCW 16.52.320 in order to outline the alternative methods that a claimant may sustain a violation of TOLA. Under RCW 16.52.205, one violates TOLA either by intentional infliction of suffering or criminal negligence. RCW 4.24.320 also requires that, if the claimant relies on one of the three remaining statutes incorporated into RCW 4.24.320, the claimant must establish that the defendant engaged in a "willful" violation of the statute. Washington law deems "willful" and wanton conduct to equate with "intentional" conduct. *In re Disciplinary Proceeding Against Vanderveen*, 166 Wn.2d 594, 607, 211 P.3d 1008 (2009); *Birchler v. Castello Land Co.*, 133 Wn.2d 106, 116, n.5 (1997).

A defendant violates RCW 9A.56.080(1) if he, with an intent to sell, defrauds or deprives the owner of the animal by willfully moving, concealing, or slaughtering a horse. The defendant breaches RCW 9A.56.083 if he, regardless of an intent to sell, defrauds or deprives the owner of the animal by the same conduct. Finally,

17

RCW 16.52.320 renders it unlawful to, with malice, kill or cause substantial bodily harm to a horse belonging to another person. Rebecca Thorley and Monica Baxter, with declarations, furnished sufficient evidence to raise a question of fact as to Donald Nowlin's violation of TOLA with regard to all four alternative means.

We focus on RCW 4.24.320's inclusion of the phrase "actual damages." Under TOLA, the successful claimant may recover "three times the actual damages sustained." The legislature did not define "actual damages" as used in RCW 4.24.320, and no Washington case construes the phrase as used in the statute.

Earlier Washington Supreme Court precedent directed the court, when determining whether emotional distress damages are available for a statutory violation, to focus on the mental state required by the statute, not the conduct of the defendant. If a violation of the statute did not require intentional misconduct, emotional distress damages were generally unrecoverable, even if the defendant's conduct in the suit was willful. *White River Estates v. Hiltbruner*, 134 Wn.2d 761, 765, 953 P.2d 796 (1998); *Washington State Physicians Insurance Exchange & Association v. Fisons Corp.*, 122 Wn.2d 299, 321 (1993). If the statute could be violated only by intentional conduct, the claimant could recover emotional distress damages. *Birchler v. Castello Land Co.*, 133 Wn.2d 106, 116 (1997). These rules followed the underlying principles that one may recover for emotional distress caused by an intentional tort, but not a negligent tort unless the defendant impacted the claimant's body.

18

Until 2015, Washington's leading case on emotional distress damages for a statute's violation was *White River Estates v. Hiltbruner*, 134 Wn.2d 761 (1998). A mobile home park tenant sued her landlord for interfering in a sale of her mobile home when the landlord refused to consent to the assignment of a park lease. The tenant claimed the landlord violated RCW 59.20.073(6), which reads, in part, "Consent to an assignment shall not be unreasonably withheld." When the jury awarded the tenant damages for emotional distress, the landlord appealed. The Supreme Court reversed the award, since the statute could be violated by negligent conduct. The high court followed the rule that, because the statute fell silent on what damages were available, emotional distress damages may be a remedy only if the violation sounds in intentional tort. Conversely, Washington declined to allow emotional distress damages when the statutory violation requires only proof of negligent, as opposed to intentional, conduct.

In 2015, the Washington Supreme Court decided *Segura v. Cabrera*, 184 Wn.2d 587, 362 P.3d 1278 (2015). Before addressing the Supreme Court opinion, we examine the Court of Appeals decision, *Segura v. Cabrera*, 179 Wn. App. 630, 319, *aff'd*, 184 Wn.2d 587, 362 P.3d 1278 (2015). As noticed by this court in *Beasley v. GEICO General Insurance Co.*, 23 Wn. App. 2d 641, 658 (2022), our decision in *Segura* set the table for the Supreme Court. This court, as did the Supreme Court, addressed whether a tenant may recover for emotional distress for a landlord's violation of the relocation assistance subsection of the Residential Landlord-Tenant Act of 1973 (RLTA), ch. 59.18

19

RCW. The section of the act demands that the landlord pay relocation costs if the tenant

must move because of uninhabitable premises. RCW 59.18.085 also affords the tenant

treble the amount of "any actual damages." A majority of the Court of Appeals followed

the traditional rule that the claimant could not recover emotional distress damages

because the statute could be violated unintentionally. A dissenter wrote that the court

should not follow a court-constructed rule of interpretation, but should instead maintain

fidelity to the legislature's intent by applying standard rules of construction. The

dissenter concluded that the legislature intended mental anguish to be recoverable, in

part, because of the modifier "any" attended to the phrase "actual damages."

The Supreme Court, in *Segura v. Cabrera*, 184 Wn.2d 587 (2015), noted the

historical rule that a statute does not provide a remedy for emotional distress unless the

statute can be violated only by conduct amounting to an intentional tort. But the Supreme

Court did not analyze the mens rea needed to violate RCW 59.18.085. The court instead

stated it should focus on the type of interest the legislature intended to protect. It did so

by reviewing all statutory language to determine the types of damages referenced. One

section of the statute mentioned recovery of relocation costs, prepaid deposits, and

prepaid rent. Since the statute only referenced out-of-pocket payments and did not

mention emotional distress, five of the justices held that the tenant could not recover for

mental anguish. So, the court adopted the Court of Appeals dissent's focus on legislative

intent found in the statute's language rather than the intentional/negligent act distinction,

20

but disagreed with the dissent's reading of the intent. Four justices agreed with the dissent that a reading of RCW 59.18.085, particularly its use of the determiner "any," signaled an intent to afford noneconomic damages.

In *Beasley v. GEICO General Insurance Co.*, 23 Wn. App. 2d 641 (2022), this court faced the question of whether "actual damages" as used in RCW 48.30.015, the Insurance Fair Conduct Act, RCW 48.30.010-.015, included noneconomic damages. We read *Segura v. Cabrera* to have abandoned the distinction between statutes that could be violated by negligent conduct and statutes that could be violated only by intentional conduct. Thus, we rejected the insurance company's argument that "actual damages" did not include emotional distress because the act could be violated with negligent action. We held that "actual damages," as used in RCW 48.30.015, included noneconomic damages.

In following the Supreme Court's decision in *Segura v. Cabrera*, this court, in *Beasley v. GEICO General Insurance Co.*, held that the term "actual damages" is ambiguous and not subject to a plain language interpretation. We examined at length the legislative history behind the Insurance Fair Conduct Act, which included both legislative action and a referendum, in order to determine the type of interest the legislation sought to protect. We noted that tort claims for an insurer's breach of a duty of good faith allowed recovery of noneconomic damages such as emotional distress. The voter's pamphlet for the referendum did not mention the specific types of damages that an

21

insured could seek. The pamphlet read that the bill would create a new, independent

legal basis for such a claim and broaden the scope of recovery, in particular by allowing

punitive damages and the tripling of damages. The pamphlet stated that the referendum

would deter unreasonable delay of payment of legitimate insurance claims. Overall,

those factors weighed in favor of an intent not to limit the types of damages available.

We contrasted the Insurance Fair Conduct Act with the tenant relocation act, construed in

*Segura v. Cabrera*, that contained specific statutory language focusing on the return of

funds spent by the tenant.

We already discussed *Birchler v. Castello Land Co.*, 133 Wn.2d 106 (1997),

wherein the Washington Supreme Court held that a claimant, under the timber trespass

statute, RCW 64.12.030, could recover emotional distress damages. Rebecca Thorley

and Monica Baxter rely on *Birchler* when arguing TOLA should also permit recovery for

emotional distress damages. We note that the timber trespass statute does not employ the

phrase "actual damages." RCW 64.12.030 only mentions "damages." The Washington

Supreme Court avoided any excursion into principles of statutory construction, but

instead rested its decision on the common law rule that the plaintiff may recover money

for mental anguish and inconvenience for an intentional tort.

Even before 2015's *Segura v. Cabrera*'s decision, the Washington Supreme Court

ignored the negligent act/intentional tort dichotomy in other decisions that construed the

phrase "actual damages" in a statute. In *Rasor v. Retail Credit Co.*, 87 Wn.2d 516, 554

P.2d 1041 (1976), the high court interpreted the term to include emotional distress damages in the federal Fair Credit Reporting Act. 15 U.S.C. § 1681o. The legislative history contained no indication of the scope of the term "actual damages." This state's high court observed that mental anguish was a type of damage likely to flow from the dissemination of false credit information about a person. The structure of the statute did not suggest an intent to limit recovery to pecuniary or out-of-pocket losses. A contrary conclusion would diminish much of the effectiveness of the remedial legislation.

In *Dean v. Municipality of Metropolitan Seattle-Metro*, 104 Wn.2d 627, 640, 708 P.2d 393 (1985), the state Supreme Court held that the phrase "actual damages" used in the employment discrimination statute, RCW 49.60.030(2), included emotional distress damages. The claimant need not show intentional infliction of distress in order to recover this element of damages.

In *Washington State Physicians Insurance Exchange & Association v. Fisons Corp.*, 122 Wn.2d 299 (1993), the Washington Supreme Court declined to permit recovery for emotional pain and suffering under Washington's CPA. The act created a private cause of action for those "injured in his or her business or property." RCW 19.86.090. This restrictive language showed an intent not to include personal injuries and mental anguish.

We have reviewed the legislative history available for TOLA, RCW 4.24.320, amendments to the act, and its four constituent statutes. The legislature adopted RCW

23

4.24.320 in 1977, when the statute used the same language employed today that reads: an action "for exemplary damages up to three times the actual damages sustained." LAWS OF 1977, ch. 174, § 3. A 1979 report for an amendment to RCW 4.24.320 notes "an outbreak of horse mutilation incidents in the state." S. COMM. ON AGRICULTURE, ANALYSIS OF FIRST SUBSTITUTE [S.B. 2142] AS OF FEBRUARY 19, 1979, 46th Leg., Reg. Sess. (Wash. 1979)

In 2008, a legislator proposed H.B. 2945, but the state legislature failed to pass it. The bill would have created a new section in the Washington code that adopted a cause of action for wrongful injury or death of a "companion animal." H.B. 2945, at 1, 60th Leg., Reg. Sess. (Wash. 2008). The owner could recover "all economic damages suffered . . . , including damages for the actual value of the companion animal to the owner, veterinary expenses, and other special care expenses." H.B. 2945, at 1. The bill defined "actual value" as the "intrinsic or peculiar value of the companion animal to the owner." H.B. 2945, at 2. The proposed bill reserved the right in the owner to recover for damages available under a claim for intentional infliction of emotional distress. H.B. 2945, at 2.

Because the legislature never adopted H.B. 2945, we decline to divine any legislative intent from the proposed 2008 bill. We could speculate that the legislature concluded that RCW 4.24.320 already allowed recovery for the malicious killing of a companion animal and the statute did not limit recovery to the "actual value" of the animal. Another proposed, but unpassed, bill introduced in 2009 would have added the

24

phrase "companion animal" to RCW 4.24.320. H.B. 1150, 61st Leg., Reg. Sess. (Wash. 2009).

A Washington House of Representatives staff summary to the 2011 bill, which created RCW 16.52.320, the crime of maliciously killing or causing substantial bodily injury to livestock belonging to another person, read:

> (In support) There have been several recent incidents where individuals have killed a rancher's livestock for malicious purposes. People seem to kill the livestock for personal enjoyment or to attract bears. Livestock owners have observed that the same people will repeatedly engage in the killing without suffering consequences. The bill will address this problem by holding these people accountable and deterring future killings.
> The civil cause of action created by this legislation will allow livestock owners to recover their losses related to the offense. A single animal can be worth around $1,500, so the losses resulting from the offense have a significant financial impact on businesses. The killing and harming of wildlife should not be included in the new crime.

H.B. REP. ON H.B. 1243, at 3, 62d Leg., Reg. Sess. (Wash. 2011). A Senate staff report for the same bill provides:

> PRO: This bill addresses behavior that is not currently addressed in existing law. One of the problems we have faced is that people have been committing what is being called spree killing in recent years. This occurs when individuals drive up to a herd of cows or horses and start shooting into the herd until the gun is empty. There is no subsequent theft. There were many of these cases in which the offender was caught, but released soon afterward.

S.B. REP. ON SUBSTITUTE H.B. 1243, at 2, 62d Leg., Reg. Sess. (Wash. 2011).

The 2011 House of Representatives legislative staff summary report suggests the legislature wanted to redress economic loss to the livestock owner. The report does not read, however, that the legislature only intended compensation for financial loss. The Senate report suggests incidents of random killings of cattle and horses prompted creation of the crime. The report, however, does not limit the scope of the crime to strangers committing senseless killings. The language of RCW 4.24.320 and RCW 16.52.320 do not limit the crime or civil liability to economic loss of livestock or to interlopers in cattle ranges.

RCW 4.24.320 expressly requires that three of the other statutes be breached by a willful act. The fourth statute, RCW 16.52.205 may be violated either intentionally or with criminal negligence. Still, like RCW 48.30.015, the Insurance Fair Conduct Act, discussed in *Beasley v. GEICO General Insurance Co.*, and 15 U.S.C. § 1681o of the Fair Credit Reporting Act, discussed in *In Rasor v. Retail Credit Co.*, the TOLA, RCW 4.24.320 does not limit the extent of damages. Unlike RCW 59.18.085, the tenant relocation act discussed in *Segura v. Cabrera*, and RCW 19.86.090, the CPA discussed in *Washington State Physicians Insurance Exchange & Association v. Fisons Corp.*, RCW 4.24.320 nowhere references recovery for damage to business, property, or out-of-pocket expenses, confirming an intent to place no restrictions on compensatory damages.

RCW 4.24.320 allows treble damages, illustrating an intent to punish the defendant. *Beasley v. GEICO General Insurance Co.* teaches that a punitive intent does

26

not conflict with allowing emotional distress damages. Regardless, if the legislature desired to punish the defendant, one would expect the defendant to be fully responsible to the injured party for all compensatory damages.

We do not intend to completely ignore *Birchler v. Castello Land Co.*, 133 Wn.2d 106 (1997) in our statutory analysis. Although not stated in the Supreme Court opinion, the court followed the principle that, because we presume the legislature knows the law in the area in which it is legislating, we will not construe a statute to derogate the common law absent an express legislative intent to change the law. *Wynn v. Earin*, 163 Wn.2d 361, 371, 181 P.3d 806 (2008); *StarKist Co. v. State*, 25 Wn. App. 2d 83, 96, 522 P.3d 594 (2023), *review denied*, 1 Wn.3d 1011, 528 P.3d 361 (2023). This principle compels a conclusion that emotional distress damages is parasitic to TOLA. Since humans generally form more of a bond with horses than trees, permitting emotional distress damages for injury to vegetation would conflict with denying such recovery for injury or death to a horse. Even those who purchase and sell horses as a commercial enterprise become attached to the respective horses.

All but one alternative method, by which one violates TOLA, entails intentional conduct. This statutory status suggests a desire to continue with the common law rule permitting emotional distress damages for an intentional tort. The one exception, RCW 16.52.205(2), entails the crime of animal cruelty in the first degree and involves criminal negligence in starving, dehydrating, suffocating, or exposing an animal to excessive heat

27

or cold. The legislature should know that such cruel treatment towards another's animal causes mental anguish to the owner, who has bonded with the animal. Since we do not allow recovery on behalf of the animal for unnecessary suffering and death, one would anticipate the legislature to desire the owner to be compensed for emotional distress damages when the legislative body has not expressly limited the type of recovery. Also, Washington has abandoned the distinction between statutory torts that may be violated only by intentional misconduct and those that may be violated with negligence actions.

The title of RCW 4.24.320 is "Action by person damaged by malicious mischief to livestock or by owner damaged by theft of livestock—Treble damages, attorney's fees." (Boldface omitted.) This title suggests that, when enacting the statute, the legislature possessed concern with harm caused to the human owner.

Donald Nowlin argues that the legislature intended for TOLA to apply only to commercial livestock and Rebecca Thorley and Monica Baxter did not purchase Brad Pitt for commercial gain. RCW 4.24.320 and its attended four statutes do not limit their terms to commercial livestock. The incorporation of the crime of animal cruelty shows a desire to protect emotional interests. If livestock are only treated as commercial chattel, cruelty to the animal is immaterial.

Donald Nowlin also highlights that Monica Thorley and Rebecca Baxter intended to euthanize Brad Pitt. Assuming such to be true, the two intended to humanely end Brad

Pitt's life, not brutally kill him for the entertainment of human beings as supported by some of Thorley and Baxter's testimony.

*Conversion*

A hundred-year succession of Washington cases supports damages for emotional distress arising from intentional torts. *Birchler v. Castello Land Co.*, 133 Wn.2d 106, 117 (1997). Conversion is the act of willfully interfering with any chattel, without lawful justification, whereby any person entitled thereto is deprived of the possession of it. *Consulting Overseas Management, Ltd. v. Shtikel*, 105 Wn. App. 80, 83, 18 P.3d 1144 (2001). Conversion is an intentional tort. *State v. Roache*, 920 N.W.2d 93, 103 (Iowa 2018); *Yuan v. Johns Hopkins University*, 452 Md. 436, 157 A.3d 254, 269 (2017); *Salima Multani v. Knight*, 23 Cal. App. 5th 837, 233 Cal. Rptr. 3d 537, 551 (2018); *Harris Group, Inc. v. Robinson*, 209 P.3d 1188, 1199 (Colo. App. 2009).

The prevailing, if not universal rule, allows recovery of mental anxiety and distress in a cause of action for conversion. 18 Am. Jur. 2d *Conversion* § 127 (2023); *Simon v. Fasig-Tipton Co.*, 652 So. 2d 1351, 1369-70 (La. Ct. App. 1995). Rebecca Thorley and Monica Baxter may recover emotional distress damages on their conversion cause of action.

*Breach of Contract and Bailment*

An animal owner may not recover emotional distress damages for injury or death to the animal under a breach of contract cause of action. *Repin v. State*, 198 Wn. App.

243, 258 (2017); *Hendrickson v. Tender Care Animal Hospital, Corp.*, 176 Wn. App. 757 (2013). By following this precedent, we deny Rebecca Thorley and Monica Baxter recovery of emotional distress damages on their breach of contract claim.

A concurring judge, in *Repin v. State*, advocated for recovery of emotional distress in a breach of contract claim for injuries or death to an animal. The concurring opinion noted the rule that one may recover for mental anguish for breach of contract if the contract or breach is in the nature that serious emotional disturbance will likely result. RESTATEMENT (SECOND) OF CONTRACTS § 353 (Am. L. Inst. 1981).

Since *Repin v. State*, the California Court of Appeals, in *Levy v. Only Cremations for Pets, Inc.*, 57 Cal. App. 5th 203, 271 Cal. Rptr. 3d 250 (2020), acknowledged a breach of contract claim for recovery of emotional distress damages when a serious breach likely elicits emotional disturbance. Still, we conclude that the Washington Supreme Court should bring any change in this area of the law.

In their appellate brief, Rebecca Thorley and Monica Baxter do not distinguish between a cause of action for breach of contract and one for breach of bailment. Thus, we do not analyze the pair's bailment claim separately.

### Jury Trial

We move to a difficult question: whether the Washington Constitution guarantees a jury trial to a litigant in a private cause of action for damages under the CPA. Although Donald Nowlin filed a jury demand, Rebecca Thorley and Monica Baxter ask this court

to recognize the constitutional right.  Thorley and Baxter do not argue that the act on its own terms grants a right to a jury.

When filing his jury demand, Donald Nowlin did not limit the causes of action, defenses, or prayers for relief for which he demanded a jury.  If a party in his demand does not specify the issues which the party wishes tried by jury, the law deems the party to have demanded a jury trial for all issues so triable.  CR 38(c).

The superior court on its own motion may strike a party's jury demand or limit the extent of the jury trial if it deems that a right to a jury trial of some or all of those issues does not exist under the constitution or statutes.  CR 39(a).  The superior court may also, for issues not triable by a jury as a matter of right, convene an advisory jury.  CR 39(c). In the alternative, with the consent of the parties, the superior court may order a trial with a jury whose verdict holds the same effect as if trial by jury had been a matter of right. CR 39(c).

In the case on appeal, the superior court ruled that neither party possessed a right to a jury trial on Rebecca Thorley and Monica Baxter's CPA claim.  The court reserved the prerogative to assign to the jury the question of a violation of the act, with the verdict being advisory to the court.  Thorley and Baxter argue that they are entitled to a jury trial on the CPA cause of action and are further entitled to the jury issuing a binding verdict.

Rebecca Thorley and Monica Baxter impliedly, if not expressly, concede that only the court, not a jury, may impose exemplary damages and injunctive relief under

31

RCW 19.86.090. But the duo contends the trial court's prerogative to resolve treble damages does not preclude a jury trial on actual monetary damages. According to the two, the common task of a jury ascertaining fault and entering a money damage verdict lies within a jury's purview. Also proving the CPA elements does not invoke equitable principles. We proceed to decide only whether Thorley and Baxter possess a right to a jury trial on the questions of whether Donald Nowlin engaged in an unfair or deceptive act or practice within the meaning of the CPA and, if so, what is the extent of economic damages sustained, if any.

Donald Nowlin characterizes Rebecca Thorley and Monica Baxter's CPA claim as lying primarily, if not solely, in equity, which disallows a jury. According to Nowlin, Thorley and Baxter primarily seek exemplary and injunctive relief. When resolving treble damages and the prayer for an injunction, the need to exercise wise judgment based on the sound application of public policy calls for a judge, rather than a jury, to address the relief. Nowlin emphasizes that monetary damages are merely the $250 purchase price less the feed costs. He highlights that the CPA does not afford a claimant emotional distress damages.

Donald Nowlin also contends that the CPA has no analog in the common law, and, thus, under Washington case law, Washington's constitution affords no right to a jury. He contends that the CPA substituted the concepts of buyer beware and recovery for intentional fraud or misrepresentation with new law barring merely "unfair or deceptive"

conduct.  Nowlin highlights language in RCW 19.86.090 that assigns to "the court," in its own discretion, whether any proven damages should be trebled and, if so, to what extent.

In resolving whether the constitution demands a jury trial at the request of a party to a private cause of action under the CPA, we review the act, cite the constitutional provision creating the right to a jury in a civil action, discuss principles applied by the Washington Supreme Court for discerning what civil actions embrace the constitutional right, examine early Washington Supreme Court decisions construing article I, section 21, analyze the difference between the two branches of the common law labeled as law and equity, mention Washington decisions that resolve whether a party to a CPA action initiated by the State enjoys the right to a jury, observe that Washington's pattern jury instructions include a section on CPA actions, apply Washington Supreme Court principles under article I, section 21 to a private CPA action, and examine foreign cases. Because a private action for damages falls on the legal, not the equitable, side of the law, we conclude that Rebecca Thorley and Monica Baxter possess a right to a jury trial.  In so ruling, we also observe that, in doubtful cases, the court must preserve the right.

The operative and procedural section of the CPA, for purposes of a private suit, declares in pertinent part:

> Any person who is injured in his or her business or property by a violation of [an unfair and deceptive acts and practice] . . . may bring a civil action in superior court to enjoin further violations, *to recover the actual damages sustained by him or her*, or both, together with the costs of the suit, including a reasonable attorney's fee.  In addition, *the court* may, in its

33

discretion, increase the award of damages up to an amount not to exceed three times the actual damages sustained: PROVIDED, That such increased damage award for violation of RCW 19.86.020 may not exceed twenty-five thousand dollars.

RCW 19.86.090 (emphasis added). The statute nowhere mentions a right to a jury. The statute mentions that the court, not a jury, may award treble damages.

The CPA, enacted in 1961, serves as Washington's principal consumer protection and antitrust statute. The heart of the consumer protection provisions of the CPA is RCW 19.86.020, which states: "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Rebecca Thorley and Monica Baxter rely only on the phrase that prohibits "unfair and deceptive acts and practices."

The 1961 act authorized actions only by the attorney general on behalf of the state. The court may grant the State remedies that include an injunction, disgorgement, restitution, recovery of costs and attorney fees, and continuing superior court jurisdiction. RCW 19.86.080 and RCW 19.86.140.

In 1970, the legislature amended the CPA to allow private suits for damages for violations of RCW 19.86.020. LAWS OF 1970, 1st Ex. Sess., ch. 26, § 2; RCW 19.86.090. The private right of action enlists the aid of private individuals to assist in the enforcement of the CPA. *Lightfoot v. MacDonald*, 86 Wn.2d 331, 335-36, 544 P.2d 88 (1976). In addition to recovering damages, a private plaintiff may seek

injunctive relief. RCW 19.86.090. Private consumers may obtain injunctive relief, even

if the injunction would not directly affect the individual's own rights. RCW 19.86.090;

*Hockley v. Hargitt*, 82 Wn.2d 337, 349-50, 510 P.2d 1123 (1973). A plaintiff in a private

action under the CPA may also obtain rescission and other equitable remedies. *Allen v.*

*American Land Research*, 95 Wn.2d 841, 851-52, 631 P.2d 930 (1981). A plaintiff must

establish five elements to prevail in a private CPA action: (1) an unfair or deceptive act or

practice (2) occurring in trade or commerce (3) with public interest impact, (4) an injury

to the plaintiff's business or property, and (5) causation. *Hangman Ridge Training*

*Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wn.2d 778, 784-85, 719 P.2d 531 (1986).

6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL

ch. 310 (7th ed. & Supp. 2022), as its description suggests, catalogs nine pattern jury

instructions for a CPA claim. The instructions, among other directions for a jury, list the

elements of a private cause of action, define unfair and deceptive acts and practices,

describe the public interest element of the action, outline the burden carried by the

claimant to show injury, and define the trade or commerce element of the cause of action.

6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 310.01,

.04, .05, .06, .08, .09 (7th ed. & Supp. 2022).

Rebecca Thorley and Monica Baxter naturally argue that the existence of an entire

chapter of the Washington Pattern Jury Instructions devoted to the CPA affords strong

evidence that either party may receive a jury trial. We disagree that the publication of the

jury instructions strongly evidences at least an initial intent by the legislature to allow a jury, and we challenge the presence of the pattern instructions as stalwartly registering the approval of the Washington Supreme Court to a jury.

Pattern jury instructions are not authoritative. *State v. Knapp*, 11 Wn. App. 2d 375, 382, 453 P.3d 1006 (2019), *aff'd,* 197 Wn.2d 579, 486 P.3d 113 (2021). The Washington Civil Pattern Jury Instructions themselves recognize their lack of binding effect. WPI 0.10 *Introduction to Washington's Pattern Jury Instructions for Civil Cases*, 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 0.10 (7th ed. 2019)

We need not rely on the existence of the pattern jury instructions to recognize the right to a jury.

Rebecca Thorley and Monica Baxter ground their right to a jury trial on the Washington Constitution. The opening phrase in WASH. CONST. article I, section 21 declares:

The right of trial by jury shall remain inviolate.

The Seventh Amendment to the United States Constitution also affords a right to a jury trial in some civil actions, but it does not apply to the states through the Fourteenth Amendment. *Minneapolis & St. Louis Railroad Co. v. Bombolis*, 241 U.S. 211, 36 S. Ct. 595, 60 L. Ed. 961 (1916). The right to a jury trial in Washington civil proceedings is

protected solely by the Washington Constitution. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 644, 771 P.2d 711 (1989).

The plain language of article I, section 21 provides the most fundamental guidance: "'The right of trial by jury shall remain inviolate.'" *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 656 (1989). The term "inviolate" within section 21 connotes deserving of the highest protection and demanding that the jury trial remain an essential component of our legal system. *Davis v. Cox*, 183 Wn.2d 269, 288-89, 351 P.3d 862 (2015), *abrogated by Maytown Sand & Gravel v. Thurston County*, 191 Wn.2d 392, 423 P.3d 223 (2018); *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 656 (1989). For such a right to remain inviolate, it must not diminish over time and must be protected from all assaults to its essential guarantees. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 656 (1989). When the question is doubtful, the court always preserves the right to a jury trial. *Bain v. Wallace*, 167 Wash. 583, 587, 10 P.2d 226 (1932); *Furnstahl v. Barr*, 197 Wn. App. 168, 175, 389 P.3d 635 (2016).

Because of the word "remain" in article I, section 21, the guiding principle in interpreting the provision entails a rearview look to the jury right as it existed at the time of the state constitution's adoption in 1889. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 645 (1989). To determine whether this right exists for a particular case, Washington courts use a two-step analysis. *In re the Detention of C.B.*, 9 Wn. App. 2d 179, 183, 443 P.3d 811 (2019). First, the court identifies the scope of the right to a jury trial in 1889.

*Bird v. Best Plumbing Group, LLC*, 175 Wn.2d 756, 768, 287 P.3d 551 (2012); *In re the*

*Detention of C.B.*, 9 Wn. App. 2d 179, 183 (2019). Second, the court decides whether the

type of action at issue is similar to one that would include the right to a jury trial at that

time. *Bird v. Best Plumbing Group, LLC*, 175 Wn.2d 756, 768, (2012); *In re the*

*Detention of C.B.*, 9 Wn. App. 2d 179, 183 (2019).

The first decision after the 1889 constitution construing article I, section 21 is

*State ex rel. Mullen v. Doherty*, 16 Wash. 382, 47 P. 958 (1897). A member of the

Tacoma board of public works brought action to oust Thomas Doherty from the office of

commissioner of public works. The trial judge ruled in favor of the relator after rejecting

Doherty's demand for a jury. On appeal, Doherty renewed his contention that the

Washington Constitution's guarantee of a jury trial extended to the suit against him. The

Supreme Court disagreed. The court wrote:

> The provision of the constitution relied upon is found in section 21, art. 1, of the declaration of rights, which, among other things, provides that "the right of trial by jury shall remain inviolate. . . ." The [foreign] decisions bearing upon this branch of the case are conflicting, but an examination of the numerous cases cited, and others not referred to, by counsel, has satisfied us that the great weight of authority in this country is against the position contended for by appellant's counsel. The effect of the declaration of the constitution above set out is to provide that the right of trial by jury as it existed in the territory at the time when the constitution was adopted should be continued unimpaired and inviolate. Section 248 of the Code of 1881, in force at the date of the adoption of the present constitution, was as follows: "Either party shall have the right in an action at law, upon an issue of fact, to demand a trial by jury."

*State ex rel. Mullen v. Doherty*, 16 Wash. 382, 384-85 (1897) (citations omitted). The court characterized the suit to oust from office as an action in quo warranto. In 1889, quo warranto was an action in equity, not in law. The Supreme Court affirmed the denial of a jury.

Section 248 of the Code of 1881, the statute affording the right to a jury trial in 1889, offers the best evidence of the nature and extent of the right to a jury at the time of the adoption of the state constitution. *State ex rel. Mullen v. Doherty* adopted, based on that statute, a simplistic test that embraces two elements: (1) the action is on the law, rather than the equity, side of the legal demarcation; and (2) issues of fact lie within the dispute. Thus, the right to a jury trial exists when a case is purely legal in nature but does not exist where a case is purely equitable. *Bird v. Best Plumbing Group, LLC*, 175 Wn.2d 756, 769 (2012). Unfortunately, the Supreme Court and the Court of Appeals have sometimes strayed from this trustworthy, clarion test. For example, Washington courts have declared that no right to a jury trial exists in statutorily created actions without common law analogues. *Bird v. Best Plumbing Group, LLC*, 175 Wn.2d 756, 769 (2012); *State Board of Medical Examiners v. Macy*, 92 Wash. 614, 159 P. 801 (1916); *State v. State Credit Association*, 33 Wn. App. 617, 621, 657 P.2d 327 (1983), *reversed on other grounds*, 102 Wn.2d 1022, 689 P.2d 403 (1984). A common law analog should be irrelevant as long as the suit falls on the side of law, not equity. Since one would be entitled to a jury trial under section 248 of the 1881 Code if the case sounds

in law, the right should not depend, in 2023, on whether the common law recognized the specific cause of action or a comparable action as long as the action does not sound in equity.

*Sofie v. Fibreboard Corp.*, 112 Wn.2d 636 (1989) functions today as the leading decision on the constitutional right to a jury in a civil trial. The decision enforces section 248 of the 1881 Code and adopts the rule in *State ex rel. Mullen v. Doherty*. The *Sofie* court rejected the defendants' argument that the right to a jury does not apply to causes of action that did not exist at the time of the constitution's adoption. The court wrote:

> A fundamental problem exists with this argument. If the right to a jury trial applies only to those *theories of recovery* accepted in 1889— rather than the types of actions that, at common law, were heard by a jury at that time—then the constitutional right to a jury will diminish over time. As a method of construing a lasting constitutional right, this makes little sense.
>
> As respondents themselves point out, this court stated in *Hunter v. North Mason High School & School Dist. 403*, that constitutional analysis is not completely frozen in time. It would defeat the intention of our constitution's framers to interpret an essential right so that it slowly withers away. An interpretation more consistent with the intended longevity of a constitutional right adapts the application of that right according to developments in the law over time. As long as the scope and nature of the right are adequately defined—and for that we can turn to a stricter historical analysis—a more flexible historical approach for determining when the right attaches will better achieve the intent of the framers.

*Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 648-49 (1989) (citation omitted).

In *Sofie v. Fibreboard Corp.*, a man afflicted with asbestosis, contracted during his work years, and his wife sued numerous asbestos manufacturers. Austin and Marcia

40

Sofie challenged RCW 4.56.520, a section of the 1986 tort reform act that limited the amount of noneconomic damages recoverable by a personal injury plaintiff. In fulfillment of the statute, the trial court reduced the couple's sizeable jury award of damages. On appeal, the Washington Supreme Court declared the statute unconstitutional as violative of the right to a jury trial.

The Supreme Court recognized that the Sofies did not plead tort theories available in 1889. The court did not identify those theories, but presumably one was a products liability claim, which did not exist in 1889. The common law did not recognize strict liability on a manufacturer for product defects and required a claimant to have contractual privity with the manufacturer to recover for harm. *Mazetti v. Armour & Co.*, 75 Wash. 622, 629, 135 P. 633 (1913); *Bray v. Marathon Corp.*, 347 S.C. 189, 553 S.E.2d 477, 483 (Ct. App. 2001), *aff'd in part, rev'd in part*, 356 S.C. 111, 588 S.E.2d 93 (2003). We do not know of any common law analog to a strict liability suit against a manufacturer.

We return to the distinction between law and equity in assessing a right to a jury. The first territorial legislature of 1854 abolished the distinction between law and equity and created one form of civil action. *Lester v. Percy*, 58 Wn.2d 501, 505, 364 P.2d 423 (1961) (Foster, J., concurring). The distinction still exists, however, when addressing a jury right, among other circumstances. The distinction between actions at law and those at equity sits in the nature rather than the form of the proceeding. *In re the Estate of Foster*, 165 Wn. App. 33, 47, 268 P.3d 945 (2011). One factor is whether the plaintiff

41

seeks money damages, a traditional legal remedy. *In re the Estate of Foster*, 165 Wn. App. 33, 47 (2011).

Rebecca Thorley and Monica Baxter seek, in part, damages under the CPA. Washington recognizes a jury right to determine the amount of damages in a civil case. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 656 (1989); *Dacres v. Oregon Railway & Navigation Co.*, 1 Wash. 525, 20 P. 601 (1889); *Baker v. Prewitt*, 3 Wash. Terr. 595, 19 P. 149 (1888). The constitutional nature of the jury's damage-finding function was underscored in *Baker v. Prewitt,* 3 Wash. Terr. 595, 19 P. 149 (1888). In that case, the territorial Supreme Court stated:

> Sections 204 and 289 of the [territorial] Code seem to require that in all actions for the assessment of damages the intervention of a jury must be had, save where a long account may authorize a referee, etc. This statute is mandatory, and we are satisfied that where the amount of damages is not fixed, agreed upon, or in some way liquidated, a jury must be called, unless expressly waived.

*Baker v. Prewitt*, at 597-98 (1888). The Supreme Court, in *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 645 (1989) quoted this passage from *Baker*.

*Sofie v. Fibreboard Corp.* focused on the requirement that the jury assess damages rather concentrating on a jury resolving liability on any particular cause of action. Still, the principles applied in *Sofie* extend to all legal claims for damages. The decision also focuses on noneconomic damages, but the decision applies to economic damages as well.

42

Washington has consistently assigned to the jury the task of determining damages as a factual issue. *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 648 (1989).

*Endicott v. Icicle Seafoods, Inc.*, 167 Wn.2d 873, 224 P.3d 761 (2010) and *Department of Natural Resources v. Littlejohn Logging, Inc.*, 60 Wn. App. 671, 806 P.2d 779 (1991) follow the teachings in *Sofie v. Fibreboard Corp.* The Supreme Court, in *Endicott v. Icicle Seafoods*, held that a party to a federal Jones Act, 46 U.S.C. section 30104 claim was entitled to a jury trial. The Jones Act affords a maritime worker the right to sue his or her employer for negligence. The claims may be asserted in either federal or state court. The court noted that Congress adopted the Jones Act after Washington became a state and adopted its constitution in 1889. Admiralty law did not permit the employee to recover against the employer in 1889. While following *Sofie v. Fibreboard Corp.*, the court applied the rule that the specific cause of action need not have existed in 1889. The court may have breached the spirit of the constitutional guarantee and *Sofie* by qualifying its ruling and stating that the specific cause of action must have had an analogy to an action available then. Since the Jones Act centered on negligence, the court reasoned that the Jones Act enjoyed an analog from the common law.

In *Department of Natural Resources v. Littlejohn Logging, Inc.*, 60 Wn. App. 671 (1991), the government brought action against Littlejohn Logging to collect the expense of fighting a forest fire allegedly caused by the negligence of the logging company. This

court held that the logging company was entitled to a jury trial under Washington Constitution, article I, section 21. When the cause of action is legal in nature, rather than equitable in character, the right to a jury trial appends to the cause. The statutory right of recovery in favor of the government for fire suppression costs did not exist in 1889. Nevertheless, the statutory cause of action relied on negligence principles. Thus, the action was the type of action considered a legal action under common law.

One would expect that, because of the existence of the CPA for sixty years and its recurrent enlistment in litigation, Washington courts would have definitively decided whether the constitution affords a right to a jury trial for a private cause of action under the act. The only cases directly addressing whether a CPA claim is jury-triable involve actions brought by the State of Washington. In *State ex rel. Department of Ecology v. Anderson*, 94 Wn.2d 727, 620 P.2d 76 (1980), *State v. Mandatory Poster Agency, Inc.*, 199 Wn. App. 506, 398 P.3d 1271 (2017), and *State v. State Credit Association*, 33 Wn. App. 617, 621 (1983), the state Supreme Court and the Court of Appeals respectively held that neither party enjoyed a right to a jury trial on a CPA claim brought by a State agency seeking to enjoin the commission of acts made illegal by statute, given the invocation of the court's equity jurisdiction.

In *State ex rel. Department of Ecology v. Anderson*, 94 Wn.2d 727(1980), our Supreme Court held that consumer protection actions brought by the attorney general afforded defendant Elwyn Anderson no right to a jury trial because of the action's

equitable nature. The State sought an injunction, restitution, civil penalties, and attorney fees. The Supreme Court held that the trial court erred in granting the defendant's demand for a jury trial. When a governmental body seeks to enjoin the commission of acts made illegal by statute, the court's equity jurisdiction is invoked. Anderson agreed that the jury could not resolve whether to issue an injunction but wanted the jury to determine whether he violated any statutes and whether he deceived any customers. The court denied a jury even to this extent.

The Washington Supreme Court, in *State ex rel. Department of Ecology v. Anderson*, reviewed the policies underlying the rule that equitable actions must be tried by a court and not to a jury. In equitable actions, if relief is to be effective, it often must be speedy, and calling a jury almost inevitably involves delay. While a jury is capable of ascertaining the facts upon which an equitable decree can be based, the function of balancing equities can be performed only by a learned judge. When extraordinary and onerous remedies are to be employed, it is essential that the judge's knowledge and understanding of equitable principles should be utilized in evaluating the evidence as well as deciding upon the relief to be granted. These reasons lack importance when Rebecca Thorley and Monica Baxter's suit has pended for six years. The rationale of extraordinary and onerous remedies may apply to an award of treble damages, but not to an award for actual damages.

In *State v. State Credit Association*, 33 Wn. App. 617 (1983), the State sued State Credit Association, Inc. (State Credit), a licensed collection agency, and several of its officers and employees, including Michael Boespflug, a debt collector. The complaint alleged violations of the Washington Collection Agencies Act, ch. 19.16 RCW and the CPA. Boespflug counterclaimed against the State for malicious prosecution and abuse of process. Boespflug also asserted a cross claim against other defendants for indemnification.

In *State v. State Credit Association*, all defendants filed a jury demand, and the State moved to strike the demand. The court denied the State's motion. In the form of answers to interrogatories, the jury returned a verdict for Michael Boespflug but against State Credit, its officers, and other employees. The court, on Boespflug's motion, then dismissed his counterclaim for malicious prosecution and abuse of process. The State appealed the judgment dismissing Boespflug.

On appeal, the State contended that actions brought by the attorney general to enforce the CPA are entirely equitable, affording the defendant no right to a jury trial. Michael Boespflug responded that his counterclaim for malicious prosecution and his cross claim for indemnification rendered the action one of mixed law and equity, and therefore triable to a jury.

This court agreed with the State that Michael Boespflug held no right to a jury trial on the CPA claim. The court reasoned that the act created a cause of action entirely

unknown to the common law. The concept of "unfair or deceptive acts or practices" proscribed by RCW 19.86.020 has no parallel in the law as it existed at the time our constitution was adopted. The court also reasoned that the relief available in a consumer protection action brought by the State is entirely equitable. The injunction is quintessentially an equitable remedy. Restitution is regarded as incidental to injunctive relief, and civil penalties are available once the court's equity jurisdiction is otherwise invoked.

Despite holding that Michael Boespflug lacked a right to a jury trial, this court in *State v. State Credit Association* still affirmed the jury verdict favoring Boespflug. At the time the superior court granted Boespflug a jury trial, Boespflug had outstanding legal claims against the State and his co-defendants, such that the case involved both equity and law claims. In a mixed case, the superior court possesses wide discretion in ordering the jury to decide none, all, or some of the causes of action based on factors announced in *Brown v. Safeway Stores, Inc.*, 94 Wn.2d 359, 617 P.2d 704 (1980). The court held that the trial court did not abuse its discretion when affording Boespflug a jury trial on the CPA claim. Thus, the court upheld the verdict in favor of Boespflug. Presumably, if the jury had found that Boespflug engaged in an unfair or deceptive act and practice, the court would have determined what, if any, injunction would be imposed on him and what restitution Boespflug must pay, while the jury resolved the amount of actual damages to grant.

We agree with this court, in *State v. State Credit Association*, that the CPA modified the common law rule with regard to consumer fraud. But we disagree with the decision's assumption that the claimant lacks a right to a jury trial because of the modification of the common law. For argument's sake, however, we analyze how the CPA modified the common law.

In *Johnston v. Beneficial Management Corporation of America*, 85 Wn.2d 637, 538 P.2d 510 (1975), a purchaser of a vacuum cleaner brought a CPA claim for a transaction that occurred before the 1970 amendment to the act that authorized a private right of action. The Supreme Court held that the 1970 amendment did not apply retroactively to a transaction preceding the amendment because the amendment created a new cause of action. The court wrote:

> Insofar as the court has been made aware, 'unfair or deceptive acts or practices,' like 'unfair methods of competition,' is a new concept and has no common law equivalent.

*Johnston v. Beneficial Management Corporation of America*, 85 Wn.2d 637, 640 (1975).

Washington courts and foreign courts consider fraud as the common law comparison to the unfair or deceptive act and practice language in the CPA. *Johnston v. Beneficial Management Corporation of America*, 85 Wn.2d 637 (1975). No Washington court has thoroughly analyzed all the differences between a common law fraud cause of action and a private action under the CPA. We outline some of those differences.

A fraud claim has nine elements: (1) a representation of existing fact (2) that is material (3) and false, (4) the speaker knows of its falsity, (5) intent to induce another to act, (6) ignorance of its falsity by the listener, (7) the latter's reliance on the truth of the representation, (8) his or her right to rely on it, and (9) consequent damages. *Baker Boyer National Bank v. Foust*, 6 Wn. App. 2d 375, 381, n.4, 436 P.3d 382 (2018). The plaintiff must prove the nine elements by clear, cogent, and convincing evidence. *Baker Boyer National Bank v. Foust*, 6 Wn. App. 2d 375, 381 (2018). The elements for negligent representation are similar: (1) the defendant supplied information for the guidance of another in a business transaction that was false, (2) the defendant knew or should have known that the information was supplied to guide the plaintiff in his business transactions, (3) the defendant was negligent in obtaining or communicating the false information, (4) the plaintiff relied on the false information, (5) the plaintiff's reliance was reasonable, and (6) the false information proximately caused the plaintiff damages. *Ross v. Kirner*, 162 Wn.2d 493, 499, 172 P.3d 701 (2007). The plaintiff must also prove the elements of negligent misrepresentation with clear and convincing evidence. *Glacier Northwest, Inc. v. International Brotherhood of Teamsters Local Union No. 174*, 198 Wn.2d 768, 800, 500 P.3d 119 (2021), *rev'd and remanded on other grounds*, 598 U.S. 771, 143 S. Ct. 1404, 216 L. Ed. 2d 28 (2023).

To sustain a CPA claim, we assume that the claimant must continue to show a representation of existing fact. Nevertheless, the fact need not be material to any

transaction. *Young v. Toyota Motor Sales, U.S.A.*, 196 Wn.2d 310, 320, 472 P.3d 990 (2020). The plaintiff likely must show the defendant held knowledge of the falsity. *Burbo v. Harley C. Douglass, Inc.*, 125 Wn. App. 684, 700, 106 P.3d 258 (2005). The plaintiff need not establish that the defendant intentionally deceived as long as he or she shows the action has the capacity to deceive a substantial portion of the purchasing public. *Haner v. Quincy Farm Chemicals, Inc.*, 97 Wn.2d 753, 759, 649 P.2d 828 (1982). The plaintiff need not show the defendant deceived anyone, only that the deceptive act or practice had the *capacity* to deceive a substantial portion of the public. *Panag v. Farmers Insurance Company of Washington*, 166 Wn.2d 27, 47, 204 P.3d 885 (2009). The plaintiff still must prove injury to his or her business or property and causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 105 Wn.2d 778, 784 (1986). The CPA requires satisfaction of elements beyond those attended to a common law fraud claim. The plaintiff must show that the unfair or deceptive act or practice occurred in trade or commerce and affected the public interest. *Panag v. Farmers Insurance Company of Washington*, 166 Wn.2d 27, 37 (2009).

RCW 19.86.020 prohibits "unfair *or* deceptive acts and practices." (Emphasis added.) An act or practice can be unfair without being deceptive. *Klem v. Washington Mutual Bank*, 176 Wn.2d 771, 787, 295 P.3d 1179 (2013). Thus, the CPA prohibits acts not considered fraud at all.

No Washington decision addresses the standard of proof for a CPA claim. In an action under the Franchise Investment Protection Act, ch. 19.100 RCW, which also promotes fairness and honesty in business, this court held that a misrepresentation claim should be evaluated under a preponderance of the evidence standard as opposed to the more stringent clear, cogent, and convincing evidence standard required for proof of common law fraud. *Kirkham v. Smith*, 106 Wn. App. 177, 183-84, 23 P.3d 10 (2001).

Despite differences with a common law or misrepresentation claim, the CPA holds the analogous policy of promoting honesty in commercial transactions. Just as a jury may determine satisfaction of the nine elements of a fraud suit, the jury, with instructions from the court, may determine whether the plaintiff fulfills the elements of a CPA cause of action. The jury may also assess economic harm. As already indicated, the drafters of Washington's pattern instructions have written a slate of instructions to give to the jury in a CPA action.

We cannot conceive a reason for denying a jury trial in an action at law if and when either the legislature or the Washington Supreme Court loosens the elements of a tort as the legislature has done in the CPA. The jury may apply the lower burden of proof just as easily, if not easier, than the fraud standard of clear, cogent, and convincing evidence. The jury, with instructions from the court, may just as easily find the elements of a CPA action as the numerous elements of fraud or negligent misrepresentation.

51

In concluding that any modifications from the common law found in the CPA should not negate the right to a jury, we return to the products liability case of *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636 (1989). The Washington Supreme Court modified the common law and adopted strict liability for manufacturers of products in 1969. *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 452 P.2d 729 (1969). Strict liability, used in the context of a products liability suit, loosens the negligence standard and allows recovery if a reasonable consumer would deem the product to be harmful or to carry inadequate warnings, despite the claimant failing to show that the product manufacturer or supplier was negligent. RCW 7.72.030; *Schuck v. Beck*, 19 Wn. App. 2d 465, 494, 497 P.3d 395 (2021). Despite this significant alteration in the law, no one, to our knowledge, has ever suggested that a products liability claim does not enjoy the jury trial right.

In *Washington State Physicians Insurance Exchange & Association v. Fisons Corp.*, 122 Wn.2d 299 (1993), the Washington Supreme Court approved a jury instruction requiring proof of a defendant's unfair or deceptive act proximately causing injury to a plaintiff's business or property. In *Sharbono v. Universal Underwriters Insurance Co.*, 139 Wn. App. 383, 161 P.3d 406 (2007), this court rejected a jury instruction using a "substantial factor" test for causation in a CPA trial. The ruling assumed that the parties possessed a right to a jury. None of the parties in *Washington State Physicians Insurance Exchange & Association v. Fisons Corp.* or *Sharbono v. Universal Underwriters* challenged the availability of a jury trial.

Foreign decisions are split on whether their respective state constitutions guarantee a jury on a statutory consumer fraud act claim brought by the consumer. Those states denying the right include Pennsylvania, Illinois, and Massachusetts. *Fazio v. Guardian Life Insurance Company of America*, 2012 Pa Super 273, 62 A.3d 396 (2012); *Werderman v. Liberty Ventures, LLC*, 368 Ill. App. 3d 78, 857 N.E.2d 320, 324 (2006); *Nei v. Burley*, 388 Mass. 307, 446 N.E.2d 674 (1983). The Illinois Constitution does not guarantee a jury in any action nonexistent at common law, even if the right is legal in nature. *Werderman v. Liberty Ventures, LLC*, 857 N.E.2d 320, 325 (2006).

In *Nei v. Burley*, 388 Mass. 307 (1983), the Supreme Judicial Court of Massachusetts ruled that a party bringing a private action under the Massachusetts CPA was not entitled to a jury trial either under the act or the Massachusetts constitution. The court also emphasized that no analog for claims of unfair and deceptive acts and practices existed in 1780, when the state adopted its constitution. The court had ruled in an earlier decision that the statutory words "unfair and deceptive practices" was not limited by traditional tort and contract law requirements.

Indiana is one of the states that affords a right to a jury in a statutory consumer protection suit. In *Lucas v. U.S. Bank, N.A.*, 932 N.E.2d 239 (Ind. Ct. App. 2010), *vacated on other grounds* 953 N.E.2d 457 (Ind. 2011) a mortgage holder filed a complaint to foreclose on the mortgaged property. The property owner counterclaimed for violations of the federal Truth in Lending Act, the Federal Debt Collections Practices

Act, the federal Real Estate Settlement and Procedures Act, and the Indiana CPA. The

property owner sought an injunction against foreclosure and damages under the various

acts, including the state act. The mortgage holder argued that the owner lacked a right to

a jury trial because the primary request for relief was an injunction and because the bank

began the suit with a request for foreclosure, which sounded in equity. The court agreed

that the trial judge would rule on the injunction, but held that the property owner was

entitled to a jury on all claims for damages. The court labeled the statutory claims as

legal causes of action under the common law because of the request for money damages.

Federal courts have discerned a right to a jury trial under the Seventh Amendment

on claims brought under federal consumer statutes. In *Kobs v. Arrow Service Bureau,

Inc.*, 134 F.3d 893 (7th Cir.1998), husband and wife Ron and Stacie Kobs sued a debt

collection bureau for violating the federal Fair Debt Collection Practices Act (FDCPA),

15 U.S.C. § 1962, et seg. The Kobs alleged the collection bureau violated numerous

provisions of the FDCPA, none of which employ the word "unfair," but one which uses

the word "deceptive." The gist of the purported statutory violations consisted of conduct

to harass, oppress or abuse the Kobs during the collection activity and making "false,

deceptive, and misleading representations." *Kobs v. Arrow Service Bureau, Inc.*, 134

F.3d 893, 896 (7th Cir. 1998). On appeal, the federal appeals court held that the trial

court committed error when refusing to submit the claim for statutory additional damages

to the jury. The court applied the analysis, under the Seventh Amendment, whereby the

right to a jury trial is determined on whether the rights under the statute are rights that would have been resolved historically at law by a jury or in equity by a judge and whether the relief requested by the plaintiff is traditionally granted by a jury at law or by a judge in equity. The court did not ask whether the common law permitted an action against a debt collector, who engaged in harassment or oppressive conduct or who published deceptive communications. In *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978), the federal appeals court reached the same conclusion under the Truth in Lending Act.

In *Tull v. United States*, 481 U.S. 412, 107 S. Ct. 1831, 95 L. Ed. 2d 365 (1987), the United States Supreme Court adopted an expansive view of the Seventh Amendment's promise of a jury in a federal civil suit, when the Court held that the amendment guaranteed a jury to a party sued by the government for a violation of the Clean Water Act. The court deemed the jury trial right extended to causes of action created by a congressional enactment as long as the nature of the action had not fallen into the jurisdiction of equity or admiralty courts under the common law.

We note that, in addition to damages, Rebecca Thorley and Monica Baxter ask for injunctive relief. We presume a trial court may deny a jury trial on a claim for actual damages in a CPA suit if other claims for equitable relief predominate over the legal claims. The Supreme Court identified seven factors for assessing when a lawsuit is primarily equitable and, thus, not subject to a jury trial: (1) who seeks equitable relief, (2)

55

is the person seeking the relief is demanding a jury trial, (3) whether the main issues are primarily legal or equitable, (4) whether the equitable issues present complexities that would affect the orderly determination of such issues by jury, and (5) whether the equitable and legal issues are easily separable. (6) The court should give great weight to the constitutional right to a jury when exercising its discretion and (7) should go beyond the pleadings to ascertain the real issue in dispute. *Brown v. Safeway Stores, Inc.*, 94 Wn.2d 359, 368 (1980). Although Donald Nowlin, on appeal, maintains that the request for injunctive relief predominates, he does not suggest that he argued such before the superior court. The superior court never engaged in any balancing under *Brown v. Safeway Stores*. Nowlin already demanded a jury trial on the contract, bailment, livestock trespass, and conversion causes of action.

Donald Nowlin emphasizes that, at the most, Rebecca Thorley and Monica Baxter will recover $250 in actual damages under the CPA. Assuming such to be true, Washington Constitution article I, section 21 places no minimum recovery on the right to a jury.

## CONCLUSIONS

We reverse the superior court's summary judgment order that denies Rebecca Thorley and Monica Baxter recovery for emotional distress damages for their cause of action for a violation of the TOLA. We also rule that Thorley and Baxter may recover emotional distress damages for their conversion claim. Finally, we also reverse the

56

superior court's order denying a jury trial for Thorley and Baxter's claim for damages under the CPA. We remand to the superior court for further action consistent with this opinion.

_____
Fearing, C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Cooney, J.